**UNION COUNTY, IOWA, Plaintiff,**

v.

**PIPER JAFFRAY & CO., INC., Defendant.**

No. 4:06–cv–374.

United States District Court, S.D. Iowa, Central Division.

Sept. 29, 2010.

Terri L. Combs, Michael A. Giudicessi, Jesse Linebaugh, Nicole N. Nayima, Faegre & Benson LLP, Des Moines, IA, Jerome A. Miranowski, Faegre & Benson LLP, Minneapolis, MN, for Defendant.

Kimberly Holst Blankenship, Timothy J. Hill, Bradley & Riley, Cedar Rapids, IA, Adam S. Tarr, Bradley & Riley PC, Iowa City, IA, for Plaintiff.

## MEMORANDUM OPINION AND ORDER

### ROBERT W. PRATT, Chief Judge.

Before the Court is a Motion for Summary Judgment filed by Defendant, Piper Jaffray & Co. Inc. ("Piper"). Clerk's No. 127. Plaintiff, Union County, Iowa ("Union County" or the "County") filed a resistance to the Motion (Clerk's Nos. 133–144),[1] Piper replied (Clerk's No. 154), and the County filed a surreply (Clerk's No. 159). The Court held a hearing on the Motion on April 9, 2010. Clerk's No. 166. The matter is fully submitted.

## I. FACTS

Union County is a political subdivision of the State of Iowa, with an approximate population of 12,000–13,000 persons between the years 1990 and 2008. Def.'s Statement of Undisputed Material Facts (hereinafter "Def.'s Facts") ¶ 1; Def.'s App. at 1898. The Union County Board of Supervisors (the "County Board") makes decisions for Union County and operates on its behalf. Def.'s Facts ¶ 2 (citing Iowa code § 331.301). The Board consists of five members, elected to staggered four-year terms. Id. ¶ 3. From 1995 to 1998,

the Board was comprised of Michael King ("King"), Michael Reasoner ("Reasoner"), Gerald McLain ("McLain"), Robert Brown ("Brown"), and JoAnn Bradley ("Bradley"). Id. ¶¶ 6–9. Bradley served as the County Board Chair in 1995 and 1996, while Reasoner served as the County Board Chair in 1997 and 1998. Id. Additional relevant county officials include Don Krings ("Krings"), Union County Auditor; Tim Kenyon ("Tim Kenyon"), Union County Attorney; and Audrey Paxton ("Paxton"), Union County Assessor. Id.

The City of Creston ("Creston" or the "City") is located in Union County, and had a total approximate population of between 7,500 and 8,000 persons between 1990 and 2008. Def.'s App. at 1899. Creston is the county seat of Union County, and Creston's City Hall is located approximately three blocks away from Union County Courthouse and from the County Board's offices. Def.'s Facts ¶ 5. Arnold "Skip" Kenyon ("Skip Kenyon"), the brother of Tim Kenyon, was the Creston City Attorney during the events giving rise to this case. Id. ¶ 10. Larry Wynn ("Wynn") was Creston's Mayor, and Joe Parker ("Parker") was the City Finance Officer. Id. ¶ 11.

Crestland Cooperative ("Crestland") is an Iowa cooperative association located primarily in Union County, with approximately 2,225 members, all of whom were entitled to receive annual financial reports regarding Crestland.[2] Id. ¶ 12. Relevant

---

1. The Court notes that Union County's manner of filing its resistance is not in conformity with Local Rule 56. Local Rule 56 provides that a resisting party must file a brief, a response to the moving party's statement of material facts, a statement of additional material facts, and an appendix. The latter three documents must be filed "as an electronic attachment to the brief under the same docket entry." L.R. 56(b)(2)-(4). While the Court recognizes that the size of the appendix in this case necessarily required it to be filed in multiple segments, in accordance with the

Electronic Case Filing Procedures Manual § VII(D)(6), the remaining documents could have, and should have, been filed in one docket entry to more readily facilitate review of the filings.

2. Union County notes, however, that none of the County Board members or County Officers were members of Crestland, and that Crestland restricted third parties, i.e., nonmembers, from accessing its financial information. Pl.'s Resp. to Def.'s Facts ¶ 12.

Crestland officials during the time frame of the events giving rise to this lawsuit included Crestland's Chief Executive Officer ("CEO") and General Manager, Larry Crosser ("Crosser"), and Crestland's Chief Financial Officer ("CFO"), Doug Elliot ("Elliot"). *Id.* ¶ 13.

Piper is a Delaware corporation headquartered in Minneapolis, Minnesota, with an office in Des Moines, Iowa. *Id.* ¶ 14. Piper is a registered securities broker-dealer and investment banker that serves, among other things, as an underwriter in municipal securities offerings. *Id.* ¶ 15. Union County notes that Piper also serves as a Financial Advisor to many of its clients and that financial advisory services are among the services offered and provided by Piper. Pl.'s Resp. to Def.'s Facts ¶ 15. Timothy Oswald ("Oswald"), the managing director of Piper's Des Moines office, served as Piper's lead representative in relation to the events underlying the present action. Def.'s Facts ¶ 16.

### A. *The Proposed Project*

At the end of the 1995 fiscal year, Crestland's financial statements indicated that Crestland and its wholly-owned subsidiary, C.C.M., Inc. ("CCM") had $443,000 in net gains or profits. *Id.* ¶ 23. In part due to these successes, Crestland's CEO and General Manager, Crosser, began discussing with Farmland Industries ("Farmland") and local leaders the idea of building a soybean crushing facility, to be known as CF Processing, adjacent to its elevator in Creston. On November 14, 1995, Farmland completed and forwarded to Crestland a feasibility study in relation to the soybean crushing plant project (hereinafter the "Development Project"). Def.'s Facts ¶ 29; Def.'s App. at 162–174. The feasibility study indicated that, to be successful, four factors were critical, namely oil marketing, meal marketing outside niche, efficient plant operations, and real crush margins. Def.'s Facts ¶ 29; Def.'s App. at 174. In regard to the crush margins, the feasibility study indicated that the soybean crushing facility would need a crush margin "average" of between $0.69 and $0.79 per bushel of soybeans to be feasible, and that the 10–year crush margin and 5–year crush margin in Union County had been $0.85 and $0.90, respectively. Def.'s Facts ¶ 29; Def.'s App. at 173–74. The study further projected that the capital cost of the project would be about $15 million, and that Farmland Industries ("Farmland") would join in the venture and make an equity investment of approximately $3 million. Def.'s Facts ¶ 25. Creston was willing to issue tax-exempt Industrial Development Revenue bonds ("IDR Bonds") on behalf of Crestland up to approximately $10 million to assist in financing the project. *Id.* ¶ 26.

### B. *Creston's Involvement in the Development Project*

In approximately October 1995, in an effort to undertake the IDR bond issuance, Creston engaged John McKinney and Linda Kniep of Ahlers & Cooney Law Firm ("Ahlers") as "Issuer's counsel."[3] *See* Def.'s Facts ¶ 27. Piper, represented by Oswald, was engaged to act as "underwriter" for the IDR Bond issuance.[4] *Id.* ¶ 28. On February 16, 1996, the Creston City

---

3. Piper characterizes McKinney as "an expert in bond financing," and characterizes Kniep as "an expert in IDR bonds. Def.'s Facts ¶ 27." Union County, however, denies these characterizations on the basis that both McKinney and Kniep "had several practice areas." Pl.'s Resp. to Def.'s Facts ¶ 27.

4. Creston had a long-standing relationship with Piper and, at some point in late 1995 or early 1996, Creston's Mayor, Wynn, suggested that Oswald meet with Crosser because Crestland needed help with the financing and construction of the soybean crushing facility. Def.'s Facts ¶ 24; Pl.'s Resp. to Def.'s Facts ¶ 17; Pl.'s App. at 510.

Council published a "Notice of Intention to Issue Industrial Development Revenue Bonds," in the *Creston News Advertiser*. Def.'s App. at 459. The Notice stated that the IDR bonds would be "limited obligations and will not constitute general obligations of the issuer nor will they be payable in any manner by taxation, but the Bonds will be payable solely and only from amounts received by the Issuer under a Loan Agreement between the Issuer and the Company." *Id.* The Notice further provided that a public hearing would be held on the issue on March 5, 1996. *Id.* On February 23, 1996, the *Creston News Advertiser* also published a Public Notice, recounting that the Creston City Council had "authoriz[ed] the execution of a Memorandum of Agreement with Crestland Cooperative and fixing a [hearing date] on the proposed issuance of [IDR] Bonds (Crestland Cooperative Project) and authorizing the Mayor and Clerk to execute the proper documentation." Def.'s App. at 729. A similar "Notice of Intention to Issue [IDR] Bonds" appeared in the *Creston News Advertiser* on February 12, 1997, and a similar "Public Notice" appeared on March 12, 1997. *Id.* at 678–79, 2490–91.

On March 6, 1996, the *Creston News Advertiser* printed an article stating that while Creston had approved a $10 million IDR bond issuance, Farmland had not yet decided whether to invest in the project. Def.'s Facts ¶ 38.

#### C. *The County Becomes Involved*

Union County did not have a prior relationship with Piper or with Oswald prior to the transactions at issue in this case. Def.'s Facts ¶ 17. Union County had,

however, participated in bond offerings, including the issuance of $500,000 in bond debt in 1982 and the refinancing and refunding of such bonds by General Obligation Notes in 1992. *Id.* ¶ 18. At the time of the 1992 issuance of General Obligation Notes, King, Bradley, Brown, and McLain were all on the County Board; Krings was the County Auditor, and Tim Kenyon was County Attorney. *Id.* ¶ 20. The 1992 General Obligation Note offering used Ruan Securities Corporation as underwriter, and Ahlers as bond counsel. *Id.* ¶ 19.

Despite its prior bond offerings, the Development Project was undisputedly one of the largest public projects ever to take place in Union County. *Id.* ¶ 37. One component of the Development Project was that it created a need for improvements to infrastructure and roads surrounding the new plant. *Id.* ¶ 34. Such improvements could be made by employing Tax Increment Financing ("TIF"),[5] which would permit a local government to charge Crestland/CF Processing for the improvements instead of making a general levy on all taxpayers. *Id.* While it appears that Creston had originally intended to undertake TIF to finance the approximately $2.7 million in expected infrastructure improvements, in approximately February 1996, the City realized that TIF debt would count against its debt capacity, and would push Creston very close to, if not over, its limit in that regard. *Id.* ¶ 39; Def.'s App. at 705. In response to this problem, Oswald suggested that an alternative would be to let Union County sponsor and TIF the infrastructure project instead of Creston. Def.'s Facts ¶ 40.

---

5. The parties define TIF as follows:

 TIF is a form of municipal financing whereby an urban renewal or TIF district is designated for targeted development. The relevant taxing entities agree to provide financing assistance to a developer proposing a development project in the district. Taxing entities designate a special fund from which taxes collected on the new development will be directed, for purposes of repaying the debt incurred.
 Def.'s Facts ¶ 35.

Throughout 1996, numerous public meetings were held regarding the Development Project, its financing, and the possibility of employing TIF to aid in financing the project. *Id.* ¶ 42. Various Union County officials attended some of these meetings. *See, e.g.,* Def.'s App. at 675 (evidencing that Krings attended a February 28, 1996 meeting); 676 (evidencing that Bradley attended a March 1, 1996 meeting); 677 (letter from Parker regarding a meeting to be held on September 11, 1996 with "cc" to Bradley, Kurt Greenfield (Union County Engineer), Krings, and Tim Kenyon); 708 (handwritten note from February 23, 1996 meeting indicating presence of King, Bradley, and Greenfield). Additionally, several articles were published in the *Creston News Advertiser* regarding the Development Project and related financing. *See, e.g.,* Def.'s App. at 2321–22 (February 7, 1996 article stating that Creston City council "[a]pproved an Inducement resolution, beginning the process for up to $10 million in [IDR] bonds for a construction project at the Crestland Cooperative"); 487 (Mar. 6, 1996 article stating that "[a]pproval to work with [Creston]

on street improvements associated with development at Crestland Co–Op was accomplished by the Union County Board of Supervisors Monday" and discussing the TIF arrangement).

By the fall of 1996, Farmland had still not committed to investing in the Development Project. Def.'s Facts ¶ 41. Crestland had indicated, though it is not clear to whom, that unless equity funding could be found, there would be no project.[6] *Id.* ¶ 53; Def.'s App. at 1457. On August 1, 1996, Creston issued the first of two "temporary" IDR bond issues, for $3.19 million, to be held in a "project fund" until a complete financing package could be arranged.[7] Def.'s Facts ¶ 55. Also in August 1996, Creston Finance Officer Joe Parker wrote a letter to Skip Kenyon attempting to orchestrate a meeting between the City, Crestland, and the County to discuss the possibility of Union County increasing its TIF bonding assistance to arrange for an "excess of funding that [could] be provided to [Crestland] as part of the package."[8] *Id.* ¶ 61. In the same month, McKinney, the County's bond

---

**6.** At the end of its 1996 fiscal year, Crestland had a net loss from operations of $1.8 million. Def.'s Facts ¶ 60.

**7.** Piper has provided a "Limited Offering Memorandum" in relation to the temporary IDR bond issuance, dated August 1, 1996. Def.'s App. at 180–205. The Limited Offering Memorandum provides that the "loaned" amount is not a general obligation of the "issuer," that the funds would remain with the bond trustee and would need to be "converted" or rolled into a new package within a year and otherwise would be redeemed. Def.'s Facts ¶ 56. The document further identifies that Piper was the underwriter for Creston's IDR bond issuances; that Ahlers was counsel to Creston; that Dorsey & Whitney Law Firm was bond counsel; that CF Processing was being built on land leased from its parent company, Crestland; that the $4.2 million in equipment used in the plant would be leased; and that the total project cost at

that point in time was estimated to be $14,586,000. *Id.* ¶ 57. The document did not state that Farmland would be involved in the project, and specifically provided that the "the Company, the Underwriter and their affiliates, are not limited in engaging future business transactions with each other." *Id.* ¶¶ 58–59. Union County emphasizes, however, that it is not clear from the record whether this document was "publically" available or whether it was ever filed with the Securities and Exchange Commission, and that there is no evidence in the record that any of the County Board members ever saw the document. *See* Pl.'s Resp. to Def.'s Facts ¶¶ 56–59.

**8.** According to the letter, invitations to the proposed meeting were sent to Oswald, McKinney, Bradley, Greenfield, Krings, Crosser, Wynn, Parker, Tom Myers (Creston Public Works Director) and Tim Kenyon. Def.'s App. at 725.

counsel, began billing his time to the County and traveled to Creston to meet with the County on August 22, 1996. *Id.* ¶ 63. On approximately August 30, 1996, Ahlers attorney Mark Cory issued an opinion letter in connection with the closing of Creston's "preliminary" IDR issue for the Development Project, stating that Ahlers had reviewed various relevant documents in connection with the bond issuance. *Id.* ¶ 64.

In October 1996, Oswald forwarded to the City, the County (via Krings), and Crestland a new estimated bond debt repayment schedule that assumed the County would issue bonds sufficient to make a $2.02 million cash grant to Crestland and pay for approximately $1.6 million in road improvements. *Id.* ¶ 65. The calculation contemplated a minimum property assessment valuation of $12 million for the TIF property in order to cover the projected debt service payments for the bonds to be issued.[9] *Id.* On October 22, 1996, Krings scheduled a November 14, 1996 meeting to discuss the Development Project, and its proposed financing terms, with the City. *Id.* at 67. In anticipation of this meeting, Oswald sent a letter to the City, the County, and Crestland, wherein he enclosed a "draft description of the process" needed to complete the Development Project, and a draft "Tax Increment Bond Plan of Finance" ("Plan of Finance"). *Id.* ¶ 69. The Plan of Finance explained that the County and CF Processing needed to negotiate a Development Agreement, to be drafted by the County's bond counsel, and also explained the underwriter's role in selling the bonds:

> [T]he County and CF Processing must begin to draft a development agreement. This agreement will call for CF to complete certain steps, and will require CF to agree to be assessed at $12 million.... This agreement will be drafted by the County's bonding attorney.
>
> Steps Necessary to sell the bonds
>
> While the above steps are being taken, the underwriter of the bonds will be drafting the bond offering documents, also known as the official statement. The underwriter will advise the county regarding the cost effectiveness of using credit ratings or other credit enhancements. The underwriter will begin working with potential investors to ensure that the bonds can be sold at attractive interest rates.
>
> Once the 30–day period (from above) is complete, the underwriter can sell the bonds and commit to the interest rates. Closing on the bond issue will occur approximately 30 days after the bonds are sold. The underwriter will work with the County Treasurer's office to ensure that the bond funds are appropriately invested until they are needed to fund the grant and public improvements.

*Id.* ¶ 70.

On November 18, 1996, the County Board held the first formal meeting at which the financial role of the County in the Development Project was discussed. *Id.* ¶ 71. While Crosser and Wynn were in attendance at the meeting, no representative from Piper was in attendance. *Id.* ¶ 73. At that meeting, King proposed a resolution to approve the Plan of Finance and to have a consulting firm, Simmering–Cory, begin drafting a Development Agreement. *Id.* ¶ 72. The next day, Bradley forwarded a draft description of the Development Project to Tom Simmering, and advised him that the County Board had authorized him to draw up a TIF plan. *Id.* ¶ 74. On December 3, 1996,

---

9. Though the County contends that it had developed a "relationship" with Piper at the time of this letter, all parties are in agreement that Piper was not actually "retained" in any capacity until, at the earliest, December 9, 1996. *Id.* ¶ 66.

attorney Frank Pechacek began billing time to Union County for work and advice to the County Assessor, Paxton, in relation to the Development Project.[10] *Id.* ¶ 75.

### D. *Interactions between Piper and the County*

A County Board meeting was held on December 9, 1996 to discuss the planned County bond issuance and Piper's involvement in it. *Id.* ¶ 77. Though Oswald had attended various other meetings in relation to the Development Project where County representatives were present, this was the first County Board meeting he attended. *Id.* According to the County, it was at this meeting that the County decided to retain Piper in connection with its part in the Development Project. *Id.* ¶ 78. County Board member King testified at deposition that he met Oswald for the first time at this meeting and that the following occurred:

> I don't remember which started the conversation, but we were told that the Crestland was looking at an expansion to build a soybean processing plant in Creston inside the city limits. The city could not bond. They were against their bond debtedness, their limit, and that they needed help from the county. They told us about the project, what they were trying to do with money put into—value-added agriculture and, of course, that was a buzz word back then. And our board felt that that was—could be a worthwhile project.
>
> Mr. Oswald was with them. And Mr. Oswald spoke and the individuals with him introduced him, said that he was a very good individual with—in represent-

ing the sales and financial end of taking care of that aspect.

> I—in our conversation going through different scenarios, you know, just formalities, talking. And finally I posed the question sitting where this young lady's at, I wasn't sure that you're—to Mr. Oswald—who do you work for. Well, I work for the county. If the county decides to go ahead with this project, I will be the county's financial officer to do this project. And I believe I asked him if he was an attorney. And I can't remember his answer. I think he said yes or no or whatever. It doesn't make any difference, but he told me that he would lead us through this project and he definitely worked for the board of supervisors if we hired him because I said I don't know. I got so many indians in here, I don't know who you work for. And everybody laughed, but I remember I asked—making that comment like it was yesterday. And he looked me square in the eyeball and said I work for you. . . .

Def.'s App. at 1501. The County asked Oswald to follow-up on this discussion by writing a letter to the County outlining Piper's expected role in the project. Def.'s Facts ¶ 79. Though the minutes of the County Board meeting do not reveal any engagement of Piper at that meeting, King testified at deposition that he left the meeting believing that Piper had been engaged to act as the County's financial advisor. *See* Pl.'s App. at 269 (King Dep.: Q. "And is it your testimony that you retained [Oswald] that day to be financial advisor and you understood what that term meant?" A. "Yes." . . . Q. "Did you have

---

**10.** Piper contends that Pechacek was an attorney with a long-standing relationship with the County, who was hired to assist with the Development Agreement. *See* Def.'s Facts ¶¶ 75–76. Union County admits that Pechacek had previously been retained by the County Assessor's office to assist with lawsuits filed against it, but contends that Pechacek was only retained in the present matter to offer an opinion on the legality of the Minimum Assessment Agreement that Paxton was to sign as part of the Development Agreement. Pl.'s Resp. to Def.'s Facts ¶¶ 75–76.

any discussion with the board members outside of Mr. Oswald's presence about whether to hire him?" A. "No. It think it was pretty much decided in the boardroom that day.").

One day later, on December 10, 1996, Oswald wrote the following letter to John McKinney of Ahlers Law Firm:

> The Board of Supervisors have instructed us to begin working with you on the process to complete a development agreement and sell G.O. notes.
>
> At their meeting on December 23, 1996, they wish to schedule a hearing on entering into a loan agreement and issuing not to exceed $4.50 million general obligation capital loan notes. . . .
>
> At the December 23 meeting, they would also like to schedule a hearing on the development agreement, holding that hearing on January 6 at 10:00 A.M. The development agreement will be between CF Processing L.C. and the County, and will call for a minimum assessment as of January 1, 1997 of $12 million. I'm not sure what other items you need for the agreement, so I'll let you contact me.

Def.'s App. at 221.

On December 12, 1996, Oswald wrote the follow-up letter requested at the Board Meeting, addressed to Union County Attorney Tim Kenyon:

> This letter is to outline our services to the county regarding the proposed issuance of TIF general obligation bonds. We will be assisting the County as the underwriter of the proposed debt.
>
> • We will attend meetings and represent the county as requested, in all aspects of completion of the financing.
>
> • We will assist the County in the creation and completion of a development agreement.
>
> • We will review the development agreement and recommend areas of concern and suggested strategy.
>
> • We will draft and prepare the offering documents for the securities to be offered.
>
> • We will advise and assist in securing a municipal credit rating or credit enhancement insurance, if appropriate.
>
> • We will make contact with Piper Jaffray's investment executives to describe the securities offering.
>
> • We will assist the County in investing the proceeds of any securities to be offered.
>
> Our fees will be not greater than 2% of the issue amount, and will be payable only upon completion of the sale of securities.
>
> As you are aware, we have been retained by the Developer to provide financing of the proposed project. We do not believe that this causes us a conflict of interest in assisting the county, however, because the only area of possible conflict is in the actual development agreement and the agreement is drafted and negotiated between the County's attorney and the developer's attorney. The underwriting of debt securities is a special and small portion of the overall project, and our services are to be limited to the structuring and sale of securities.
>
> The Supervisors have requested that we assist in the development agreement to provide analysis of the proposed minimum assessment and timing of the minimum assessment, and in calculating the amount to be offered the developer.
>
> We are comfortable with this responsibility and will covenant not to participate in assisting the developer in negotiating the agreement. As the above noted items are the major points of *financial interest* to the county or any municipality doing a similar type of agreement, these are the only items we

would generally advise an issuer regarding. We are comfortable that the County will be adequately represented regarding financial matters.

Def.'s App. at 233–34. Tim Kenyon forwarded the letter to the County Board and to McKinney, but neither Tim Kenyon, the Board Members, nor McKinney ever asked any follow-up questions regarding the letter.[11] Def.'s Facts ¶¶ 89–90.

### E. *Additional Happenings*

On January 31, 1997, a consultation meeting was held regarding the creation of a TIF district, the County's note issuance, and the City's IDR issuance.[12] *Id.* ¶ 91. Indeed, from early 1996 to October 6, 1997, at least forty meetings were held regarding the Crestland expansion project, its financing, and the possible creation of a TIF district.[13] *Id.* ¶ 100. On February 28, 1997, Oswald wrote to Mark Cory at Ahlers, wherein he stated it was his "understanding that you have been provided

comments on the [Development Agreement for Union County] by the developer's attorney." *Id.* ¶ 101; Def.'s App. at 236. Oswald wrote that he had "not heard of those comments," but was "assuming at this point that they are not substantive with respect to the security offered by the Coop or the County's obligations." Def.'s App. at 236. Oswald then laid out that the next step in the process was to hold a public hearing on the Development Agreement, stating, "Once the hearing has been held, it would be appropriate to approve and execute the development agreement."[14] *Id.*

In March 1997, the City sponsored a second temporary IDR issue for $4.81 million, for which Piper again prepared a Limited Offering Memorandum. *Id.* ¶ 92. The Limited Offering Memorandum was disclosed to Ahlers,[15] made no reference to Farmland, and revealed that Piper was serving as underwriter for the IDR issue, that the equipment for the Development

---

**11.** The County emphasizes that the County Board did not have any follow-up questions because, when considering the letter in conjunction with Oswald's statements at the December 9, 1996 meeting, the County Board was satisfied that it had retained a financial advisor to assist it. *See* Pl.'s Resp. to Def.'s Facts ¶ 89 (citing deposition testimony by King and Reasoner that each believed Oswald was to act as a financial advisor).

**12.** Also in late 1996 to early 1997, Crestland was considering a merger with the nearby Greenfield and Fontanelle cooperatives. Articles about the planned mergers ran on January 30, 1997 on the front page of the *Creston News Advertiser*, and on February 12, 1997, and March 5, 1997 in the *Adair County Free Press*. *Id.* ¶¶ 97–99. The March 5, 1997 article printed the balance sheets for all three cooperatives. *Id.* ¶ 99.

**13.** The County points out that the evidence reflects that a County official was present at only twenty-one of these meetings, seventeen of which were County Board meetings, and only after Oswald suggested to the City that the County become involved. Pl.'s Resp. to

Def.'s Facts ¶ 100. The County further points out that Oswald was "present or invited to several of the identified meetings—the majority being County Board meetings." *Id.*

**14.** In March 1997, Creston and the Southern Iowa Council of Governments ("SICOG") worked with Crestland to prepare and file a successful grant application with the Iowa Department of Economic Development. Def.'s Facts ¶ 102. According to Piper, Board Member Bradley sat on the SICOG Board at the time of this grant application, which included Crestland's financial statements. *Id.* ¶¶ 102–03. The County, however, denies that Bradley ever saw Crestland's financial statements. Pl.'s Resp. to Def.'s Facts ¶ 103.

**15.** Piper contends that the Limited Offering Memorandum was "publically disclosed," but the County points out that there is no evidence in the record revealing that the document was filed with the Securities and Exchange Commission. *See* Pl.'s Resp. to Def.'s Facts ¶ 92.

Project would be leased, that the Development Project would be "located on land owned by the Crestland Cooperative," that the total project cost was $15 million, and that the source of funds for the project would come from the IDR issues, the equipment lease, and $2.5 million in "equity." *Id.* Ahlers additionally received, reviewed, and commented on various drafts of the Official Statement to be issued with the City's IDR Bond issue, some of which included financial information on Crestland. *Id.* ¶ 93.

On May 5, 1997, Oswald and Crosser attended the County Board meeting and asked the County to make an additional "cash grant" to the Development Project of $2 million, to which the County agreed. Def.'s Facts ¶ 104. At the meeting, the County expressed that they would like to get all relevant materials at least one week in advance so that the documents could be reviewed. *Id.* ¶ 105. Oswald agreed to aid the County in this regard, and sent a letter to Cory and McKinney on May 5, 1997, wherein he stated that the County had "instructed us to begin the process of authorizing an additional cash grant to CF Processing ... in the amount of $2 million," and additionally requested that full copies of all documents be sent to Tim Kenyon and Don Krings, and that Oswald also receive copies of documents so that he could put them into folders he was preparing for the County to permit them one week's review. Def.'s App. at 263. Oswald did, in fact, make notebooks for each of the County Board members containing proceedings and information for their review. Def.'s Facts ¶ 106. On May 27, 1997, Union County approved an increase in the assessed valuation of the property from $12 million to $19 million, to cover repayment of the increased cash grant from Union County. *Id.* ¶ 123.

On June 2, 1997, Oswald distributed a "timeschedule" for the "Union County,

Iowa Urban Renewal General Obligation Capital Loan Notes," wherein he listed various dates, events, and responsible parties. Def.'s App. at 859. For June 9, 1997, the document listed "Execution of Development Agreement" with Responsible Parties "Board/Devel./Counsel." *Id.* The same date listed "First draft of official statement available," with Responsible Party "Underwriter." *Id.* Responsible Parties were further defined as: 1) Counsel or Bond Counsel—Ahlers; 2) Underwriter—Piper; 3) Board—Board of Supervisors of Union County, Iowa; 4) Staff—Primarily Don Krings and Tim Kenyon; and 5) Developer—CF Processing, L.C. and Crestland Cooperative, Creston, Iowa. *Id.* Consistent with the timetable, on June 9, 1997, Oswald forwarded a draft of the Official Statement to Ahlers and to Krings, who in turn distributed it to the Board Members. Def.'s Facts ¶ 108. The draft official statement included a provision stating that, "Historically, industrial machinery, equipment, and certain computer property has been taxed as real property at 30% of the net acquisition cost...." *Id.* ¶ 109. While the County denies that this was sufficient to notify them that certain equipment would be fully or partially exempt from taxation, it does not genuinely dispute that Paxton, the County assessor knew that there was a phase-out of taxation for industrial machinery and equipment. *See* Pl.'s Resp. to Def.'s Facts ¶¶ 109–10.

In July 1997, after reviewing a feasibility study and engineering report, First Bank Systems ("FBS"), Crestland's Bank, agreed to expand Crestland's financing and issue a Letter of Credit ("LOC") for the City's IDR bond issue, subject to various conditions. Def.'s Facts ¶ 111; Def.'s App. at 864–65. On July 17, 1997, Oswald sent a letter to the County Board stating that Crosser had received word from Crestland's bank that "they would guaranty an issue of [IDR] bonds that will be

used to fund the construction of the new soybean plant." Def.'s App. at 287. Oswald stated that Piper "had asked [the County] to hold moving forward with the $4 million cash grant, the development agreement and the proposed bonding until [Crosser] could confirm that this piece of business had been completed." *Id.* Oswald continued: "Now that it is moving forward, it is time to pick up your process and move it forward." *Id.* Oswald noted that he had visited with Crosser "about completing the process with [Paxton] to allow for approval of the development agreement. I understand he is working with [Paxton] in this regard. We should try and have approval of this document as soon as all of the pieces are filled in." *Id.* Oswald enclosed an updated timetable for completion of events, listing the same "Responsible Parties" as being responsible for various events, including a listing that the County Board, CF Processing, Crestland,

and Ahlers were responsible for "Execution of the Development Agreement." *Id.* at 289.

Mark Cory of Ahlers prepared and negotiated the Development and Minimum Assessment Agreements related to the County's bond issuance and distributed them for comment and discussion to Amy Beattie, Crestland and CF Processing counsel, Frank Pechacek, and the County Attorney.[16] Def.'s Facts ¶ 116. From February 6, 1997, through October 6, 1997, Ahlers prepared, revised, and circulated at least six drafts.[17] *Id.* ¶ 122. Kenyon assisted Paxton in determining whether to sign the Minimum Assessment Agreement by compiling a list of needed items and by recommending to the County Board that Paxton and Crosser meet to discuss areas of concern; Paxton and Crosser did, in fact, meet to discuss issues relating to the Minimum Assessment Agreement.[18] *Id.* ¶¶ 118–21. At some point, Paxton in-

---

16. The County notes that "drafts were also circulated to Tim Oswald. Oswald reviewed and commented on numerous drafts of the Development Agreement, communicating his comments and changes to Cory and, on one occasion, requesting that Cory prepare a new version of the Development Agreement." Pl.'s Resp. to Def.'s Facts ¶ 116. The only document the County cites that actually supports its assertion that Oswald received any draft copies of the Development Agreement, however, is a letter Cory sent to Tim Kenyon on May 7, 1997, wherein Cory comments that "[a]t Tim Oswald's request, we have prepared a second draft of the Agreement between Union County and CF Processing. As you can see, the City of Creston has now been added as an additional party." Def.'s App. at 265. Plaintiff's other citations do not support the assertion that Oswald "reviewed and commented on numerous drafts." *See* Pl.'s Resp. to Def.'s Facts ¶ 116 (citing a draft of the Development Agreement (Def.'s App. at 511) and Oswald's December 12, 1996 letter to the County (Def.'s App. at 233–34)). Indeed, Piper denies that Cory circulated the Development Agreement to Oswald for comment, denies that Oswald participated in negotiating

it, and notes that Oswald only reviewed it to "check the valuation number for the property and the start date for the payment of taxes." Def.'s Facts ¶ 117.

17. The County again contends that "drafts were consistently copied and circulated to Tim Oswald." Pl.'s Resp. to Def.'s Facts ¶ 122. Again, the County cites the May 7, 1997 letter from Cory to Tim Kenyon. The County additionally cites a letter from Cory to Krings, which encloses a revised Development Agreement that claims to have "cc'ed" Oswald with "enclosures" on September 12, 1997. *Id.* (citing Def.'s App. at 763). The final supporting reference is to a letter from Cory to Pechacek dated October 2, 1997, wherein Cory notes that he has incorporated suggestions Pechacek made to Paxton into the Development Agreement. *Id.* (citing Def.'s App. at 804). The letter contains the notation, "cc: Tim Oswald" at the bottom. Def.'s App. at 804.

18. On September 24, 1997, Crestland filed a ground lease between Crestland and CF Processing with the Union County Recorder, of which Paxton was aware. *Id.* ¶ 94.

quired of Pechacek "what happens if the amount of levy drops such that the assessment agreement does not produce enough taxes to cover the local government outlay." Def.'s Facts ¶ 125; Pl.'s Resp. to Def.'s Facts ¶ 125. Pechacek advised Paxton that the Minimum Assessment Agreement could guarantee a minimum dollar amount of taxes the developer would have to pay, and further provided that if the funds paid to Union County from the tax assessment failed to cover the debt service, CF Processing was to pay the difference. Def.'s Facts ¶ 126. Union County ultimately obtained an agreement by Crestland to guarantee CF Processing's performance [19] under the Development and Minimum Assessment Agreements.[20] *Id.* ¶ 127. Pechacek also advised Paxton regarding the requirements for determining whether the valuation was reasonable, not to sign the Assessor Certification of the Minimum Assessment Agreement until Paxton had reviewed the plans and specifications for the new plant, and not to finalize the certification without a legal survey of the property. *Id.* ¶ 130. Neither Tim Kenyon nor Paxton recall ever consulting with Oswald or with anyone from Piper in any respect in the course of preparing and negotiating the Development Agreement.[21] *Id.* ¶ 136.

19. Reasoner testified that "the question was asked if CF Processing is unable to pay, what happens and then the discussion was then would Crestland Co-op back that ... and then Mr. Crosser said yes." Def.'s App. at 1581. Reasoner testified, given that Crestland's reputation was "very good," he "thought that was another positive that we would have some financial assurance because Crestland, which had been doing its expansion apparently must be in pretty good shape." *Id.*

20. Oswald testified regarding the guarantee and other security as follows:

Q. All three bonds [the City's IDR bonds] was aware of, the two temporary ones and the final?
A. I'm not—I can't comment as to the County's knowledge of the two temporary bonds, but they were irrelevant. The County certainly knew of the permanent bond.
Q. Was the County aware that there was letter of credit that was contemplated to secure those bond issues?
A. At the point in time the County entered into the agreement, the letter of credit wasn't available.
Q. Did the County ever know that a letter of credit was something that was pursued, do you know?
A. I don't remember.
Q. Do you recall ever telling the County that the letter of credit was not something that was going to part of the IDR bond issuances?
A. I think I did tell them that.
...

Q. And do you know whether there was a discussion about that issue?
A. I recall a request by a supervisor to inquire as to whether a mortgage could be attained by the county to support his cash contribution.
...
Q. Do you recall what the response was?
...
A. That a mortgage was unavailable, that Crestland's assets were mortgaged to FBS and that CF Processing's plant would be mortgage to the bondholders. The equipment would be secured by the lease through CIT.
Q. So you told the County that they could not get a mortgage—
A. Correct.
...
Q. And do you recall anything more about that conversation?
...
A. That supervisors asked if a guarantee of the parent company was available ... I don't remember if we responded at that meeting or at a follow-up, but our response was that a guarantee was available. That would be a guarantee of the minimum assessment agreement under the development agreement.
Pl.'s App. at 515–17.

21. The County maintains, however, that Tim Kenyon and Paxton were not responsible for negotiating and drafting the development agreement, and contend that "Oswald worked closely with the Ahlers firm in preparing and

## F. The County's Bond Issuance

On October 6, 1997, Piper forwarded to the County a formal written proposal to underwrite Union County's first bond issuance. Def.'s Facts ¶ 127; Def.'s App. at 313–14. On the same date, Tim Kenyon wrote to the County Board to state that he had reviewed "the final set of materials prepared by Mr. McKinney in connection with the Capital Loan Notes. If the Board chooses to go forward, we should closely follow the recommendations of bond counsel." Def.'s Facts ¶ 140. In a second letter to the County Board on the same date, Tim Kenyon wrote that he had "reviewed the final draft of the Development Agreement" and that "[b]ased upon my review and examination of the final draft, I know of no legal objection to the execution of the document. As we have discussed, the final decision to proceed rests with the Union County Board of Supervisors." Id. ¶ 142. At a County Board meeting also held on October 6, 1997, the County Board passed a resolution agreeing to accept Piper's underwriting proposal and further authorizing the parties to negotiate and enter into a Loan Agreement [22] between the County and Piper.[23] Id. ¶ 143. The County Board further voted to enter into the Development and Minimum Assessment Agreement. Id. ¶ 144.

Thus, Union County, Creston, CF Processing, and Crestland entered into a "Tax Increment Development Agreement" and "Minimum Assessment." Pl.'s Facts ¶ 1; Def.'s App. at 361–81. Under the terms of the Development Agreement, Union County agreed to make "a grant to [CF Processing] in the amount of Four Million Dollars," and to pay up to another $1.5 million for road improvements near the CF Processing plant, in exchange for CF Processing's agreement to pay increased property taxes in an amount that would fully cover Union County's debt service on bonds it was issuing in connection with the financing. Id. ¶¶ 2–3. Specifically, CF Processing agreed to be assessed at a minimum amount of $19 million.[24] Def.'s

negotiating the Development and Minimum Assessment Agreement on behalf of the County." Pl.'s Resp. to Def.'s Facts ¶ 136. In support, the County again points to the two letters showing that Oswald was "cc'ed" on draft copies that Cory sent to others, and Cory's May 7, 1997 letter to Tim Kenyon, wherein Cory comments that "At Tim Oswald's request, we have prepared a second draft of the Agreement between Union County and CF Processing. As you can see, the City of Creston has now been added as an additional party." Id.; Def.'s App. at 265.

22. The County passed a formal resolution to approve and authorize the Loan Agreement on November 3, 1997. Def.'s Facts ¶ 158. Upon signing the Loan Agreement, the County became contractually obligated to issue the notes. Pl.'s Resp. to Def.'s Facts ¶ 160.

23. The Loan Agreement, which was drafted by Ahlers, entered between Piper and the County provided that the parties "represent and agree that no financial advisory relationship as defined by Rule G–23 of the Municipal Securities Rulemaking Board has existed between them with respect to this Loan Agreement or presently exists between them with respect to other similar matters. . . ." Def.'s App. at 316; Def.'s Facts ¶¶ 150–51.

24. As part of the Minimum Assessment Agreement, Paxton signed the following certification:

The undersigned, having reviewed the plans and specifications for the Minimum Improvements to be constructed and the market value assigned to the land upon which the Minimum Improvements are to be constructed, and being of the opinion that the minimum market value contained in the foregoing Minimum Assessment Agreement appears reasonable, hereby certifies as follows: The undersigned Assessor, being legally responsible for the assessment of the property described in the foregoing Minimum Assessment Agreement, upon completion of Minimum Improvements to be made on it and in accordance with the Minimum Assessment Agreement, certifies that the actual value assigned to such land, building and equipment upon completion shall not

Facts ¶ 146. CF Processing's obligations under the Development Agreement were guaranteed by Crestland. Pl.'s Facts ¶ 4; Def.'s Facts ¶ 148. Pursuant to the terms of the Development Agreement, the County issued a total of $5.885 million in general obligation capital loan notes in 1997 and 1998 (the "Notes") to provide the cash grant to CF Processing and to fund the road improvements, obligating the County to pay nearly $10.5 million in debt service over time.[25] Id. ¶ 5. Though the County declined to purchase bond insurance for the 1997 Note issuance, it opted to do so for the 1998 Note issuance. Def.'s Facts ¶¶ 168–69. On May 29, 1998, Krings received a letter from the bond insurance carrier stating that the bond insurance policy would be delivered to Union County's bond counsel. Id. ¶ 171. No other insurance was actually procured in relation to the Note issuances. Id. ¶ 172.

As agreed, Piper prepared Union County's Official Statements for the 1997 and 1998 issuances of Notes. Id. ¶ 6. Regarding the Official Statement in relation to the 1997 Note issuance, totaling $4.325 million, Piper is listed in Appendix A, under the heading "Consultants," as "Financial Consultant." Def.'s App. at 326. The 1997 Official Statement, however, contains a heading labeled "Underwriting," which

provides, in part: "The Notes are being purchased, subject to certain conditions, by Piper Jaffray Inc., (the 'Underwriter'). The Underwriter has agreed, subject to certain conditions, to purchase all, but not less than all, of the Notes at an aggregate purchase price of $4,216,875 plus accrued interest to the Closing Date." Id. at 323. Piper maintains that it was erroneously listed as "Financial Consultant" in Appendix A of the 1997 Official Statement, but that the error was duly corrected in relation to the 1998 Note issuance, totaling $1.56 million.[26] See Def.'s App. at 389–433. Indeed, in the 1998 Official Statement, Piper is listed in Appendix A, under the heading "Consultants," as "Underwriter." Def.'s App. at 397. As in the 1997 Official Statement, the 1998 Official Statement contains a heading labeled "Underwriting," which provides nearly identical language to that contained in the previous version, save for a modified aggregate purchase price. Id. at 393.

G. *Events Following the Note Issuances*

The Development Project, operated by CF Processing, was constructed and completed on schedule and began soy processing operations in the Fall of 1998. Def.'s Facts ¶¶ 182, 184. The infrastructure improvements financed by the 1998 County

---

be less than Nineteen Million Dollars ($19,-000,000), until termination of this Minimum Assessment Agreement pursuant to the terms hereof.
Def.'s Facts ¶ 147.

**25.** On November 3, 1997, the County issued $4.325 million of General Obligation Capital Loan Notes. Def.'s Facts ¶ 161. On November 4, 1997, the City issued its Official Statement for the $8 million IDR bond offering. Id. ¶ 162. On November 10, 1997, Ahlers issued an opinion that the Loan Agreement and 1997 note issuance were valid and binding obligations for the County. Id. ¶ 163. On June 10, 1998, the County issued its Official Statement for the issuance of $1.560 million of General Obligation Capital Loan Notes.

Id. ¶ 174. On June 15, 1998, the County passed a formal resolution to enter into another Loan Agreement (which contained the same terms as the first Loan Agreement) with Piper in relation to the second Note issuance. Id. ¶ 175. The Ahlers firm again opined that the Loan Agreement and the 1998 Notes were binding general obligations for the County. Id. ¶ 176. On August 10, 1998, Ahlers sent a letter to the County regarding the 1997 and 1998 Note issuances, stating, "This completes this matter for the County." Id. ¶ 177.

**26.** None of the County Board members testified that they saw the reference in the document to Piper as "Financial Consultant," or that they relied on it in any way. Def.'s Facts ¶ 157.

note issuance were also completed. *Id.* ¶ 183. Following the closing of the 1998 Note issuance, the County had no further interaction, involvement with, or dealings of any kind with Oswald or with Piper. Def.'s Facts ¶ 180. Piper did, however, during 1998 and for a period thereafter, continue to provide investment banking services to Crestland. *Id.* ¶ 185. Such services included underwriting the issuance of an $8.835 million corporate bond by Crestland in August 1998, and underwriting the issuance of $2.510 million in corporate bonds by Crestland in 1999, which was used to increase Crestland's working capital. *Id.* ¶ 186. Piper also continued to assist Crestland in seeking a new long-term bank financier and in obtaining equipment financing for CF Processing. *Id.*

Crestland reported a profit at the end of its 1997 fiscal year. Def.'s Facts ¶ 149. At the end of its 1998 fiscal year, Crestland again reported a profit. *Id.* ¶ 179. On August 31, 1999, however, Crestland's bank refused to finance any of the CF equipment purchase or installation costs, requesting that another lender be found. *Id.* ¶ 187. In late 1999, believing that April 1999 was the "low point" for fiscal year 1999, Crestland's Bank, U.S. Bancorp Ag Credit did several things: it raised Crestland's interest rate by 50 basis points; reduced its revolving line of credit from $25 million to $15 million; refused to provide Swine USA, another Crestland start-up, with any separate financing; required Crestland to try to sell yet another start-up, Livestock USA; told Crestland to continue efforts to place a new bond through Piper to replenish working capital; and declined to renew a $750,000 LOC listing subsidiary CCC as a beneficiary. *Id.* ¶ 188; Pl.'s Resp. to Def.'s Facts ¶ 188. The bank's internal reports in 1999 noted that a combination of losses from the start-up of these companies and historically low soybean crushing margins and swine mar-

kets led to Crestland's consolidated year to date loss. Def.'s Facts ¶ 189. The bank further noted that historically bad crush margins, weak export markets, and "sobering" declines in farm income (the lowest since the mid 1980s) were a further indicator of potential accounts receivable collection problems for Crestland in future months. *Id.* In February 2000, Crestland's CPA auditing firm resigned due to a disagreement with Crestland concerning representations to its members about financial performance. *Id.* ¶ 190. In August 2000, Crestland's senior lender stopped lending to Crestland and Crestland obtained Firstar as a lender. *Id.* ¶ 191. Also in August 2000, Piper advised Crestland that it must redeem the bonds from the City's IDR bond issue because it had exceeded its $10 million capital improvement limit for keeping those bonds in tax-exempt status. *Id.* ¶ 192.

On September 26, 2001 Crestland filed for bankruptcy. *Id.* ¶ 193. In Crestland's filings with the Bankruptcy Court, it stated:

> In 1997 ... the Co-op decided to merge with [five other] local agricultural cooperative associations. During the following four years, the added debt service and operations expenses of expanding operations, coupled with low grain and soy bean prices, caused the Co-op to suffer considerable financial losses three out of the last four years. Since 1997 the Debtor has made ... approximately $13,100,000 in capital improvements [unrelated to the bean plant, and] ... approximately $22,000,000 in building and outfitting a soy processing facility [CF Processing].

> Based on the aforementioned investments the two most significant impacts to the financial plight of the Debtor were its grain storage operations and its investment in the CF Processing facili-

ties and operation. The Debtor's investment in grain storage and handling facilities was never able to turn a profit for the Co-op's members specifically because the Debtor was not able to secure an operating line of credit sufficient for such a large operation.... At 20 million bushels, the Debtor required, at a minimum, a $40,000,000 operating line of credit, just for its grain storage operations.

Because of restrictions placed on it by its primary secured creditor, U.S. Bank, N.A., who provided the Debtor with its operating line of credit, only made $15,000,000 to $20,000,000 at most available to the Debtor. Additionally, the $15–20 million dollar line of credit had to apply to all of the Debtor's business operations, not just the Debtor's grain storage operations. The limited nature of the Debtor's operating line of credit effectively prevented the Debtor to carry grain for periods which would allow the Debtor to capture a larger margin and recoup a reasonable return on the Debtor's grain storage investments. Another contributing factor to the Debtor's financial problems was its investment and operating of its CF Processing soy processing operations. CF Processing began soy processing operations in the fall of 1998. During the following 30 months, the Debtor suffered a complete loss for Seven (7) months, during which the facility ceased operations while a Flash Dissolvitizing System was added. During the Seven (7) months, the Debtor received no return on its investment, and very little revenue was generated. Additionally, during this same 30 month period, the entire soy processing industry suffered by seeing the worst "crush margins" in the entire history of the crushing business.

Additional significant factors contributing to the Co-op's financial problems included losses associated with the Debt-or's investment in the Swine USA limited partnership before March 2001. Additionally, Crestland's decision to start and maintain an investment in a Do It Best home center business in Creston proved to be an additional financial burden, as that investment never turned a profit.... Finally, all of the above financial issues were significantly amplified by an ever expanding rumor mill, starting at approximately the end of February 2001.

Def.'s Facts ¶ 195.

On October 25, 2001, CF Processing also filed for bankruptcy. *Id.* ¶ 194. At no point prior to its bankruptcy did CF Processing ever indicate to Union County that it had any problem making its tax payments or was in any way suffering a hardship regarding them. *Id.* ¶ 198. Indeed, prior to its bankruptcy filing, CF Processing had, either on schedule or early, made three years of agreed-upon tax payments, totaling $1,977,661.54. *Id.* ¶ 197. On November 15, 2001, Union County filed a proof of claim in the CF Processing bankruptcy for $806,030 "yearly assessment on bond issue." *Id.* ¶ 199. On the same date, Union County filed a proof of claim for $258,346 in taxes (which were unrelated to the taxes due from the CF Processing facility under the Minimum Assessment Agreement) in Crestland's bankruptcy. *Id.* ¶ 200. In March 2002, the Bankruptcy Court approved the sale of Crestland's real estate to DeBruce Grain for $6.5 million, "free of all liens and encumbrances, except those held by U.S. Bank, First Union, and other secured creditors." *Id.* ¶ 201.

In November 2002, Union County opposed an attempt by CF Processing to convert its Chapter 11 bankruptcy into a Chapter 7 proceeding, asserting that continued operations of the CF Processing plant were "in the best interests of Union County and the residents and taxpayers of

Union County, stating its willingness to consider amending the agreements to keep the operations going." *Id.* ¶ 202. In April 2003, the CF Processing's bankruptcy action was dismissed. *Id.* ¶ 203. In May 2003, Union County entered into a Standstill Agreement with CF Processing whereby it agreed to accept a fixed, lower payment of taxes than those required under the Minimum Assessment Agreement so that the company could keep operating. *Id.* ¶ 204. In exchange, the County was granted an option to purchase the equipment and company bonds for $5 million. *Id.* Other creditors agreed to forego their right to proceed against the leased plant equipment so that CF Processing could remain operational. *Id.* On May 29, 2003, Union County moved to amend its proof of claim in the Crestland bankruptcy to add $412,130 in taxes it claimed Crestland owed under the Minimum Assessment Agreement. *Id.* ¶ 205. The Bankruptcy Trustee objected to the amendment. *Id.* ¶ 206. Also in May 2003, the County sought to obtain a reassessment of the real property previously owned by Crestland (and now owned by DeBruce Grain), arguing that the assessor "failed to consider the increased value to the land resulting from the buildings and improvements to the value of the leasehold." *Id.* ¶ 207. The County contended that the value set by the Minimum Assessment Agreement should be reapportioned 15% to the land (totaling $2.85 million) and 85% to the buildings and improvements. *Id.* ¶ 207. The County withdrew its attempt to reassess the real estate in June 2003, voting to restore the assessment on DeBruce's property and the $19 million assessment on CF Processing's facilities. *Id.* ¶ 209.

In July 2003, Union County passed a resolution to modify the Minimum Assessment Agreement and to abate certain back taxes, provided that the parties reach mutually acceptable terms for an Amended Minimum Assessment Agreement and that the County receive all tax payments owed through and including September 2003. *Id.* ¶ 210; Pl.'s Resp. to Def.'s Facts ¶ 210. In October 2003, Union County entered a Stipulation of Voluntary Settlement of Tax Protest whereby it agreed to assess DeBruce's property at $13,830 and CF Processing's property for the remainder of the $19 million. Def.'s Facts ¶ 211. In December 2003, DeBruce transferred its rights to the property described in the Development Agreement to Creston Bean Processing, LLC via quitclaim deed. *Id.* ¶ 212. In February 2004, Union County entered into a settlement agreement, agreeing to settle its $2.11 million back tax claim against CF Processing for $500,000 so that CF Processing could be sold to Creston Bean and remain an intact taxpaying entity in Union county. *Id.* ¶ 213. The County Board approved the agreement on February 4, 2004. *Id.* ¶ 215. In October 2006, the Bankruptcy Court denied Union County's Motion to Amend, noting:

- The lawyers in the two bankruptcies never indicated they viewed the debt under the Minimum Assessment Agreement as being owed by both Crestland and CF Processing, and they only discussed the debt in the context of the CF Processing case.

- Crestland only became liable on CF Processing's default and was therefore not liable for it at the time it filed for bankruptcy because Crestland filed first.

- Union County never sought to amend its proof of claim against Crestland until after CF Processing's bankruptcy case was dismissed and the Court stated "it cannot be overlooked that Union County filed the motion for leave to amend Proof of Claim Number 844 only after it would have been certain

that the CF Processing case had been dismissed."

- The Court noted that Union County did not file any objection to dismissal of the CF Processing bankruptcy either.
- That while "the development agreement indicates the responsibilities of Crestland and CF Processing are joint and several, the contract also indicates Crestland agreed to that arrangement only upon default or breach of the agreement by CF Processing and only upon notice," and this was not fair notice to Crestland that they intended to assert this claim.

Def.'s Facts ¶ 216. CF Processing remains operational today and continues to be one of Union County's ten largest taxpayers. *Id.* ¶ 215.

## II. STANDARD OF REVIEW

The term "summary judgment" is something of a misnomer.[27] *See* D. Brock Hornby, *Summary Judgment Without Illusions,* 13 Green Bag 2d 273 (Spring 2010). It "suggests a judicial process that is simple, abbreviated, and inexpensive," while in reality, the process is complicated, time-consuming, and expensive. *Id.* at 273, 281. The complexity of the process, however, reflects the "complexity of law and life." *Id.* at 281. "Since the constitutional right to jury trial is at stake," judges must engage in a "paper-intensive and often tedious" process to "assiduously avoid deciding disputed facts or inferences" in a quest to determine whether a record contains genuine factual disputes that necessitate a trial. *Id.* at 281–82. Despite the seeming inaptness of the name, and the desire for some in the plaintiffs' bar to be rid of it, the summary judgment process is well-accepted and appears "here to stay."[28] *Id.* at 281. Indeed, "judges are duty-bound to resolve legal disputes, no matter how close the call." *Id.* at 287. Federal Rule of Civil Procedure 56(b) provides that "[a] party against whom relief is sought may move at any time ... for summary judgment on all or part of the claim." "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.,* 541 F.2d 207, 209 (8th Cir. 1976) (citing *Windsor v. Bethesda Gen. Hosp.,* 523 F.2d 891, 893 n. 5 (8th Cir. 1975)). The purpose of summary judgment is not "to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broad. Sys., Inc.,* 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). Rather, it is designed to avoid "useless, expensive and time-consuming trials where there is

---

27. Judge D. Brock Hornby, a District Court judge for the District of Maine, convincingly suggests that the name "summary judgment" should be changed to "motion for judgment without trial." Hornby, D. Brock, *Summary Judgment Without Illusions,* 13 Green Bag 2d 273, 284 (Spring 2010).

28. Judge Hornby notes that over seventy years of Supreme Court jurisprudence gives no hint that the summary judgment process is unconstitutional under the Seventh Amendment. *Id.* at 281 (citing *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 336, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) and *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). While he recognizes that not much can be done to reduce the complexity of the summary judgment process, he nonetheless makes a strong case for improvements in it, including, amongst other things, improved terminology and expectations and increased pre-summary judgment court involvement. *See id.* at 283–88.

actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.,* 545 F.2d 1127, 1129 (8th Cir.1976) (citing *Lyons v. Bd. of Educ.,* 523 F.2d 340, 347 (8th Cir.1975)).

Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment upon motion after there has been adequate time for discovery. Summary judgment can be entered against a party if that party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is appropriately granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and that the moving party is therefore entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir.1994). The Court does not weigh the evidence, nor does it make credibility determinations. The Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers,* 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.") (citing *Weight Watchers of Quebec, Ltd. v. Weight Watchers Int'l, Inc.,* 398 F.Supp. 1047, 1055 (E.D.N.Y.1975)).

In a summary judgment motion, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. If the moving party has carried its burden, the nonmoving party must then go beyond its original pleadings and designate specific facts showing that there remains a genuine issue of material fact that needs to be resolved by a trial. *See* Fed.R.Civ.P. 56(e)(2). This additional showing can be by affidavits, depositions, answers to interrogatories, or the admissions on file. *Id.; Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

Courts do not treat summary judgment as if it were a paper trial. Therefore, a "district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994). In a motion for summary judgment, the job of a court is only to decide, based on the evidentiary record that accompanies the moving and resistance filings of the parties, whether there really is any material dispute of fact that still requires a trial. *See id.* (citing *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505 and 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2712 (3d ed. 1998)). It is the

responsibility of the parties to provide the evidence necessary for this assessment. *Id.* at 921.

## III. LAW AND ANALYSIS

### A. *Union County's Claims*

Union County argues that Piper clearly undertook to be the County's financial advisor at the December 9, 1996 meeting, and that the December 12, 1996 letter from Piper to the County emphasized Piper's agreement to undertake this role. According to the County, it thereafter relied on Piper, as its financial advisor to " 'recommend areas of concern' on the Development Agreement and otherwise 'represent' and protect it with respect to 'financial matters' [ ] and to 'raise red flags' about any aspects of the financing that could negatively impact the County." Pl.'s Br. at 10. The County contends that Piper woefully failed in that capacity, and made numerous affirmative misrepresentations to the County, and also failed to disclose certain relevant information.

Specifically, the County contends that Piper affirmatively "misrepresented" the following matters: 1) Piper told the County that an LOC was not available to secure CF Processing and Crestland's debt service obligations under the Development Agreement, when an LOC was, in fact, available; 2) Piper told the County that a mortgage was not available to secure CF Processing and Crestland's debt service obligations under the Development Agreement, when a mortgage was available; 3) Piper represented to the County, "through advising the County to proceed," that Crestland's guarantee of the CF Processing's debt service was adequate protection for the County, even though Piper "was aware of Crestland's weak finances and 'lackluster financial performance' "; 4) the County "directed" Piper to secure insurance to guarantee CF Processing and Crestland's debt service obligations, but

Piper failed to do so; 5) Piper advised the County to proceed in executing the Development Agreement, despite knowledge by Piper that Crestland had unstable historical financial performance, that there was no insurance behind CF Processing and Crestland's debt service obligations; and that the $19 million assessment was "high"; and 6) Piper advised the County that "I work for you" and disclaimed any conflict on providing financial advice to the County, despite knowing it had conflicts because it also represented CF Processing, Crestland, and the City. Pl.'s Br. at 22–23.

The County further contends that Piper failed to advise the County of the following relevant facts or information: 1) failed to disclose feasibility studies on CF Processing that were in Piper's possession; 2) failed to disclose an appraisal showing that Crestland's property was worth less than $6 million; 3) failed to reveal knowledge by Piper that the $19 million assessment was "high"; 4) failed to recommend an independent feasibility study and appraisal of the CF Processing project for the benefit of the County; 5) failed to disclose that the City of Creston was participating in the financing of IDR bonds and information related thereto; 6) failed to reveal conflicts, such as representation of the City, CF Processing, and Crestland; 7) failed to protect the County's interests by facilitating Crestland in incurring additional debt that competed with the debt owed to the County; 8) failed to advise that Farmland was not providing an equity investment in CF Processing; 9) failed to advise that Piper had rejected an LOC for the City's IDR bond issuance, thereby freeing this source of security for the benefit of the County; and 10) failed to disclose that no insurance had been obtained to protect the County's general obligation in case of default by CF Processing or Crestland. *Id.* at 23–24.

## B. Elements of the Claims

### 1. Breach of fiduciary duty.

To sustain its claim for breach of fiduciary duty, the County bears the burden of proving: 1) the existence of a fiduciary relationship; 2) Piper breached a fiduciary duty to the County; 3) Piper's breach of its fiduciary duty to the county was a proximate cause of damage to the County; and 4) the amount of damage. *See* Iowa Jury Ins. 3200.1.

### 2. Breach of contract.

■ To establish a claim for breach of contract, Union County must prove the following five elements:

(1) the existence of a contract; (2) the terms and conditions of the contract; (3) that [plaintiff] has performed all the terms and conditions required under the contract; (4) [that] defendant[ ] breach[ed] ... the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.

*Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998) (citing *Iowa–Illinois Gas & Elec. Co. v. Black & Veatch*, 497 N.W.2d 821, 825 (Iowa 1993)).

### 3. Negligence.

■ "Negligence is generally defined as conduct that falls below the standard established by law for the protection of others against unreasonable risk of harm." *Knake v. King*, 492 N.W.2d 416, 417 (Iowa 1992). Under Iowa law, the elements for a cause of action for negligence are: 1) the existence of a duty to conform to a standard of conduct for the protection of others; 2) the failure to conform to that standard; 3) proximate causation; and 4) damages. *Hartig v. Francois*, 562 N.W.2d 427, 429 (Iowa 1997) (citing *Marcus v. Young*, 538 N.W.2d 285, 288 (Iowa 1995), and W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 30 (5th ed. 1984)).

### 4. Negligent misrepresentation.

The Iowa Supreme Court has identified the following factors as requisites to success on a claim of negligent misrepresentation:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) [T]he liability stated in Subsection (1) is limited to loss suffered

(a) by the person ... for whose benefit and guidance he intends to supply the information ...; and

(b) through reliance upon it in a transaction that he intends the information to influence....

*Barske v. Rockwell Int'l Corp.*, 514 N.W.2d 917, 924 (Iowa 1994); *see* Iowa Civil Jury Inst. 800.1.

### 5. Fraud.

■ The elements for the tort of fraud are similar in many regards to the elements of negligent misrepresentation. A plaintiff seeking to hold a defendant liable for fraud must demonstrate: 1) a representation; 2) that the representation was false; 3) that the representation was material; 4) that the defendant knew the representation was false; 5) that the defendant intended to deceive the plaintiff; 6) that the plaintiff justifiably relied on the representation; and 7) that the representation was a proximate cause of plaintiff's damage. *See Smidt v. Porter*, 695 N.W.2d 9,

22 (Iowa 2005); *see also* Iowa Civil Jury Instr. 810.1.

### C. *Counts One through Five: Can Union County Demonstrate that Piper's Actions or Omissions were the Proximate Cause of its Damages?*

To generate a genuine issue of material fact on any of its five claims, Union County must present evidence that Piper's alleged misrepresentations or omissions proximately caused Union County's damages. Accordingly, since a determination of proximate causation impacts the sustainability of *all* of Plaintiff's claims, the Court addresses it first. In this case, Piper argues that Plaintiff cannot establish that Piper proximately caused Union county's damages. Specifically, Piper contends that it did everything it was required to do. It "underwrote and helped issue the two County Notes without incident." Def.'s Br. at 35. The County then made a cash grant to the Development Project, the bean plant was built, road improvements were made, CF Processing went into operation and "paid $1.9 million in agreed upon property taxes for *three years before* its parent, Crestland, filed for bankruptcy in September 2001." *Id.* According to Piper, even assuming that it owed duties to "advise" the County with regard to the propriety of entering into the Development Agreement, the bankruptcies of Crestland and CF Processing constitute a superseding cause of the County's damages, regardless of any claimed wrongful actions or inactions by Piper. Those bankruptcies were caused by factors entirely unforeseeable and outside the control of Piper, such as changes in agricultural markets, overexpansion, a tightening of credit, and other financial difficulties. Indeed, according to Piper, the premise of Union County's causation argument is "itself illogical" in that "the County's cause of action would still be available if the bean plant had paid its taxes for ten or fifteen years, instead of three, before failing." Def.'s Br. at 37.

The County, on the other hand, argues that it "hired Piper to provide financial advice . . . to ensure the protection of the County's general obligation for debt service under the Development Agreement." Pl.'s Br. at 52. "Had Piper done what it promised to do in December 1996, the County would not be facing a $7 million loss." *Id.* According to the County, the "issue is the fact that Piper denied the County the ability to make a fully-informed decision about putting its general obligation at risk in connection with this transaction." *Id.* (emphasis omitted). As noted, the County contends that Piper "sat on undisclosed information to the County" that Crestland indicated were key factors in its eventual bankruptcy. The County specifically points out that Piper knew that at least one feasibility study had indicated that "future gross crushing margins will be significantly lower than they are currently," that crushing margins were considered an important factor in CF Processing being a successful venture, and that historically low crushing margins were identified by Crestland as a significant cause of its bankruptcy. *Id.* at 53–54. The County further contends that, after the execution of the Development Agreement and the note issuances in 1997 and 1998, Piper helped Crestland to rack up additional debt,[29] which competed with the County's

---

**29.** Piper argues that the County cannot demonstrate that Piper owed it a duty not to assist Crestland in incurring debt that would compete with CF Processing and Crestland's payments to the County under the terms of the Minimum Assessment Agreement. While Piper has presented the Court with some cases that hold that a fiduciary owes no continuing duty once the fiduciary relationship has terminated, none of those cases are directly on point (and the Court has been unable to locate any cases that *are* on point) and the Court is not sufficiently familiar with the normal duties associated with financial advisory

note obligations and facilitated Crestland's bankruptcy which, in turn, facilitated CF's bankruptcy and the subsequent failure of tax payments by CF. *Id.* at 52–53. Moreover, the County contends that it "emphatically directed Piper to obtain some type of insurance to protect the County taxpayers in the event CF and Crestland breached their debt service obligations under the Development Agreement." Pl.'s Br. at 9. Piper failed in this duty, according to the County, and thus the County was left totally unprotected when first Crestland, and then CF Processing, filed for bankruptcy. Union County urges that the bankruptcies of Crestland and CF Processing fall squarely within the scope of Piper's original risk and, thus, cannot be considered superseding causes of the County's harm.

 "[Q]uestions of … proximate cause are ordinarily for the jury to decide," though "they may be decided as matters of law in exceptional cases." *Scoggins v. Wal–Mart Stores, Inc.,* 560 N.W.2d 564, 566–67 (Iowa 1997) (citations omitted); *see also Hagen v. Texaco Refining & Mktg., Inc.,* 526 N.W.2d 531, 538 (Iowa 1995) ("[P]roximate cause is a fact question for the jury."). Under Iowa law, causation has two components: 1) " 'the defendant's conduct must have *in fact caused* the plaintiff's damages (generally a factual inquiry)' " and 2) " 'the policy of the law must require the defendant to be *legally responsible* for the injury (generally a legal question).' " *Scoggins,* 560 N.W.2d at 567 (quoting *Gerst v. Marshall,* 549

N.W.2d 810, 815 (Iowa 1996)). In conducting the factual inquiry, a court must look to two components: 1) "whether the harm would not have occurred *but for* the negligence of the defendant, and 2) whether the negligence of the defendant was a substantial factor in bringing about the harm." *Id.* (citing *Gerst,* 549 N.W.2d at 817). In evaluating whether a defendant's conduct is a "substantial factor" in bringing about the harmed sustained, courts must look to the " 'proximity and foreseeability of the harm flowing from the actor's conduct, although it is not necessary that the actual consequences of a defendant's negligence should have been foreseen.' " *Id.* (quoting *Kelly v. Sinclair Oil Corp.,* 476 N.W.2d 341, 349 (Iowa 1991)).

 In conducting the legal inquiry, the court must determine if " 'the policy of the law will extend responsibility to those consequences which have in fact been produced by an actor's conduct.' " *Id.* (quoting *Kelly,* 476 N.W.2d at 349). Ordinarily, this question can be answered affirmatively where it can be shown that there is "no other rule of law relieving the actor of liability because of the manner in which his negligence resulted in the harm," *id.* (quoting *Kelly,* 476 N.W.2d at 349), and where the resultant harm "result from the risks that made the actor's conduct tortious." *Thompson v. Kaczinski,* 774 N.W.2d 829, 837 (Iowa 2009).[30] The legal inquiry, also known as the "scope of liability" inquiry, is "fact-intensive as it requires consideration of the risks that made the actor's conduct

---

services to make a conclusion on this issue. Indeed, the only significant evidence in the record about what duties a financial advisor owes to a client is from Robert Doty's expert report, upon which Piper insists the Court cannot rely.

**30.** Iowa courts historically considered whether a defendant's conduct was a "substantial factor" in bringing about a plaintiff's harm under both the factual and legal inquiries of

the proximate cause analysis. *See, e.g., Gerst,* 549 N.W.2d at 815–16. In 2009, however, the Iowa Supreme Court adopted the modified proximate cause analysis advocated by the Restatement (Third) of Torts, which clearly places the "substantial factor" element in the factual inquiry, and which recharacterizes the legal inquiry as an "assessment of scope of liability." *See Thompson,* 774 N.W.2d at 837.

tortious and a determination of whether the harm at issue is a result of any of those risks." *Id.* Notably, an actor will be relieved of liability, and found not to be a legal cause of a plaintiff's harm, if the defendant's conduct is "superseded by later-occurring independent forces or conduct." *Hayward v. P.D.A., Inc.,* 573 N.W.2d 29, 32 (Iowa 1997).

■ "To conclude that an event or conduct constitutes a superseding cause, the court must find that 'the later-occurring event is such as to break the chain of causal events between the actor's [conduct] and the plaintiff's injury." *Id.* (quoting *Kelly,* 476 N.W.2d at 349); *see also Reed v. Chrysler Corp.,* 494 N.W.2d 224, 231 (Iowa 1992) ("Conduct that, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the result complained of and without which the result would not have occurred, is a proximate cause of the event."). "Such a finding prevents a finding of proximate cause even when the actor's conduct is found to be a cause-in-fact of the plaintiff's harm." *Hayward,* 573 N.W.2d at 32. "When a superseding cause is found, the law considers that cause 'to be the effective harm, and relieves the defendant from liability for the earlier negligent act.'" *Id.* (quoting *Sumpter v. City of Moulton,* 519 N.W.2d 427, 431 (Iowa Ct.App.1994)). "'In order for an intervening act or force to relieve an individual from liability, the harm must not have been a normal consequence of his acts or have been reasonably foreseeable.'" *Id.* (quoting *Haumersen v. Ford Motor Co.,* 257 N.W.2d 7, 15 (Iowa 1977)); *see also Thompson,* 774 N.W.2d at 838 (noting that foreseeability is a "critical" consideration in an analysis of superseding causation and quoting *Scoggins,* 560 N.W.2d at 568–69 for the proposition that "an injury which could not have been foreseen or reasonably anticipated as the probable result of an act of negligence is not actionable and such an act is either the

remote cause, or no cause whatever, of the injury"). " 'An intervening force which falls squarely within the scope of the original risk, [however,] will not supersede the defendant's responsibility.'" *Hayward,* 573 N.W.2d at 32 (quoting *Hollingsworth v. Schminkey,* 553 N.W.2d 591, 598 (Iowa 1996)).

■ While the Court has serious doubts as to whether the County will ultimately be able to prove that any alleged action or omission by Piper was the proximate cause of its damages in this case, it nonetheless must agree with the County that, at this stage of the proceedings, the matter is one for a jury. Assuming that the jury could find the other elements of the County's claims satisfied, the simplified causation picture would be that which the County alleges, i.e., Piper owed a duty to the County to advise it with respect to the Development Agreement, Piper failed to properly advise the County, and as a result, the County was not adequately protected in its general obligation liability when CF Processing and Crestland went bankrupt. If a jury determined that Piper did undertake some duty to advise the County with respect to the Development Agreement, then the likely harm that would result from Piper's failure in that duty would be that the County would sustain financial harm in the event that CF Processing and Crestland failed to make tax payments sufficient to cover the County's debt service on its Note issuances. This is sufficient to generate a jury question on the factual inquiry under the proximate cause analysis.

■ Piper's argument, however, does not directly address the factual inquiry of the analysis; rather, it focuses almost exclusively on the legal inquiry, i.e., Piper argues that the bankruptcies of Crestland and CF Processing were superseding causes of Union County's harm

as a matter of law, such that Piper would be relieved from liability for the County's harm in any event. A determination of whether a later event is a superseding cause of a plaintiff's harm "is usually a question of fact, and it is a question of law only in extreme circumstances where it is manifestly clear that the intervening conduct was a superseding event." *Iowa Elec. Light & Power Co. v. General Elec. Co.*, 352 N.W.2d 231, 235 (Iowa 1984). Taking the evidence in the light most favorable to Union County, the Court is not convinced that it is "manifestly clear" that the bankruptcies were a superseding cause of harm. Indeed, a reasonable jury could find that a bankruptcy of either CF Processing or Crestland was precisely the type of event that would foreseeably put the County's general obligation at risk, such that the bankruptcies arguably "fall squarely within the scope of the original risk" Piper took in failing to adequately and appropriately advise the County.

The Court finds unconvincing Piper's protestation that the County's argument is "itself illogical" because the cause of action would still be available to the County if the bankruptcies had occurred fifteen years after the Note issuances, rather than three years later. The mere fact that a claim *could* be made after fifteen, or even nineteen years, does not mean that such a claim *would* be sustainable. This is because the legal component of the proximate causation analysis necessarily evaluates whether a claimed cause "is so remote or attenuated that liability should not be imposed." *Sweeney v. City of Bettendorf,* 762 N.W.2d 873, 883 (Iowa 2009). If the County were bringing this identical claim, with the variation that CF Processing and

Crestland had filed bankruptcy fifteen years after the Note issuance, the Court could say with some confidence that any act or omission by Piper was so remote and attenuated that it could not legally sustain a finding of proximate causation. While the Court cannot opine as to the precise number of years at which it would find causation too attenuated, it does believe that the passage of only three years is not inherently so remote or attenuated as to foreclose proximate causation as a matter of law. Accordingly, the Court finds that the issues of proximate causation and superseding causation must be submitted to a jury for resolution.

D. *Count One—Breach of Fiduciary Duty: Was there a Fiduciary Relationship Between Union County and Piper with Respect to the Development Agreement?*

The parties dispute whether Piper was acting solely as Union County's underwriter for the issuance of General Obligation Notes or whether Piper was also acting as Union County's financial advisor with regard to the propriety of Union County's involvement in the Development Project generally. Piper steadfastly maintains that it acted only as an underwriter of securities, and that the normal rule, that "underwriters owe no special duty to issuers and the two are considered as contractual counterparties," should be applied in the present case. Def.'s Br. at 15 (citing Robert A. Fippinger, *The Securities Law of Public Finance* § 8:11.5 at 8–182 (2d ed. Supp. 2009) ("No issuer of municipal securities ... should be under the misunderstanding that an underwriter is an employee or agent of the issuer.")). The County concedes that, as a general matter, underwriters owed no fiduciary duties to the issuer of securities.[31] Union

---

**31.** According to Piper, the County does not assert that Piper owed and breached fiduciary duties to it in Piper's role as an underwriter of the securities. While it is true that the County is not objecting to Piper's performance of underwriter duties *with respect to the issuance of the securities,* the County does contend, that with respect to the Development Agreement and the Minimum Assessment Agreement, Piper breached its duties regard-

County maintains, however, that Piper agreed to do more than act as an underwriter on the sale of securities, i.e., it agreed to act as Union County's financial advisor with respect to the drafting and negotiation of, and the propriety of entering into, the Development Agreement. According to the County, it was Piper's role as Union County's "financial advisor" on the Development Agreement that gives rise to a fiduciary relationship or a special duty, and it is in this capacity that Piper breached its duties to Union County by failing to inform Union County of important information and by failing to perform certain tasks. *See* Pl.'s Resistance Br. at 34–36. Specifically, Union County argues that it "relied on Piper as its financial advisor" to " 'recommend areas of concern' on the Development Agreement," to otherwise " 'represent' and protect it with respect to 'financial matters,' " and to " 'raise red flags' about any aspects of the financing that could negatively impact the County, including ramifications of entering into the Development Agreement and pledging its taxpayers' general obligation behind $6 million in debt service." Pl.'s Br. at 10 (citations omitted).

While Union County articulates an extensive list of ways in which Piper breached its duty to the County, these alleged breaches are of no significance unless Union County can demonstrate that Piper owed it some duty, fiduciary or otherwise, in the first instance. To that end, Union County contends that a fiduciary relationship, whereby Piper agreed to act as Union County's "financial advisor," was created at the December 9, 1996 County Board meeting, and was reinforced by the follow-up letter Oswald sent to Union County Attorney on December 12, 1996. With respect to these events, the County points to several portions of the deposition testimony in this case as supportive of the creation of a "financial advisory" relationship that gave rise to fiduciary duties flowing from Piper to the County at the County Board Meeting on December 9, 1996:

Q. Tell me as best you can recall what happened at that meeting [on December 9, 1996]?

A. I don't remember which started the conversation, but we were told that Crestland was looking at an expansion to build a soybean processing plant in Creston inside the city limits. The city could not bond. They were against their bond debtedness, their limit, and that they needed help from the county. They told us about the project, what they were trying to do with money put into— value-added agriculture and, of course, that was a buzz word back then. And our board felt that that was—could be a worthwhile project. Mr. Oswald was with them. And Mr. Oswald spoke and the individuals with him introduced him, said that he was a very good individual with—in representing the sales and financial end of taking care of that aspect. I—in our conversation going through different scenarios, you know, just formalities, talking. And finally I posed the question sitting where this young lady's at, I wasn't sure that you're—to Mr. Oswald—who do you work for. Well, I work for the county. If the county decides to go ahead with this

less of whether Piper was acting as an underwriter or as a financial advisor. *See* Pl.'s Br. at 19 ("This also amounted to a violation of Piper's obligations to the County, whether as its advisor or merely underwriter."); 23 ("These actions by Piper ... violated industry practice of financial advisors and underwriters"); 24 ("Not only are these breaches of Piper's obligations to the County ... [they] are in violation of industry custom and practice, for both underwriters and advisors.").

project, I will be the county's financial officer to do this project. And I believe I asked him if he was an attorney. And I can't remember his answer. I think he said yes or no or whatever. It doesn't make any difference, but he told me that he would lead us through this project and he definitely worked for the board of supervisors if we hired him because I said I don't know. I got so many indians in here, I don't know who you work for. And everybody laughed, but I remember I asked—making that comment like it was yesterday. And he looked me square in the eyeball and said I work for you

. . . .

Q. Had you ever met Mr. Oswald before?

A. Never. To the best of my recollection, never.

Q. Who introduced him as someone who was very good to represent people? Who said that?

A. I remember . . . somebody saying he was very good at the job he did. And Tim [Oswald] made the comment I'm the best at the job I do. That's the words he said. And I said, well, that's what we want. And I said, you know—I can't remember in detail who said what or where, but at that time, he assured me that he worked for us because I didn't know who was representing the county, who was representing the city. I wanted somebody to look out for the best interest of the county.

Q. Did you ask him—are you saying that it was not represented to you that he worked for the company and the city, that you didn't understand that?

. . .

A. I already answered you. I was never told that he worked for either one of them.

Q. Did you ask him whether he did?

A. Yeah, I did. I said who do you work for. And [Oswald] said, you. If you hire me, I work for you. And that's fine because I did not know—I said I don't know the rest of these indians in here and everybody kind of chuckled. And I said I don't know who you work for, but if we go through this project, you work for the county. And I sat where this young lady's at and I said that's good enough for me.

Q. What did you say to him about what he was going to get paid?

A. He talked what his fee structure was. He got a percentage as a financial officer and—

Q. Percentage of what?

A. Percentage of the bonds—

Q. Like the Ruan deal?

A.—I believe. No that's a different story.

Q. How is it different?

A. Ruan was a broker the way I looked at it. . . . It's just broker. Mr. Oswald told us that he would be our financial officer, our financial person, that we did not have to worry about any of the financial. He would take care of all of that, the agreements, the whole nine yards.

Q. Did he give you a resume?

A. He was going to send a letter down to our county attorney. They talked back here, but he didn't—he did say that he was—like I say, he was with Piper, you know. And sometimes, you know—back then, you trust the companies that had good names. I did anyway, you

know. Reputable companies deal with people that are reputable, you know.

Q. Did you discuss with him whether or not Piper would be acting as an underwriter versus a financial advisor?

. . .

A. Both.

Q. What did that mean to you?

A. He would buy the bonds, sell them. And he also would make sure that all the paperwork—all the agreements, TIF, urban renewal, all those things would be put into place and that he would oversee it and be, in my mind, as simple as it can be sometimes the project manager. He would oversee the whole thing.

Q. Did you know what a financial adviser, what the term meant in the investment banking industry at the time he made the presentation?

A. Did I understand at the time? Yeah, that he was going to do it all and he was basically going to make it—he was going to be—make a wage for doing that, yes, I did.

Q. And is it your testimony that you retained him that day to be financial adviser and you understood what that term meant?

. . .

A. Yes.

Q. How did you know what that term meant?

A. Probably because of 12 years of education and couple years of college and having a pretty nice portfolio at the time, still do, that—I know fry cooks in southwest Iowa would have a little bit of knowledge of that.

Q. Did you have any discussion with the board members outside of Mr. Oswald's presence about whether to hire him?

A. No. I think it was pretty much decided in the boardroom that day. He was to get with Mr. Kenyon, send down a letter.[32] Basically, stated that he was going to—what his expectation would be. And Mr. Kenyon, county attorney, dealt with that.

Pl.'s App. at 262–70 (King Dep.)

Q. Do you recall reviewing or receiving [Oswald's December 12, 1996 letter]?

A. I recall that this letter was the result of a Board meeting.

Q. Okay. Describe to me what you remember about that.

A. Well, again, we have different people in and our board would have free flow questions. And people were asking at the time, for instance, Mr. Oswald, can we do this or what should we do that. And I think it came to the point, you

---

**32.** Oswald testified that the County Board Members and the County Attorney requested that he write a follow-up letter to outline Piper's expected "role in the transaction."

Q. Do you recall preparing this [letter dated December 12, 1996]?
A. Yes.
Q. And you sent it to Mr. Kenyon?
A. Yes.
Q. Why?
A. Mr. Kenyon asked, at the board meeting before I drafted this letter, about whether

we had a conflict of interest, and at that meeting, we discussed the issue, and I told them that I would send a letter about it or about our services and that they would be able to choose do they want us to proceed, do they want us involved or not.
Q. So your view of this letter is you were setting out—you were answering the conflict of interest question that was posed to you by Mr. Kenyon?
A. And outlining our role in the transaction.
Pl.'s App. at 543–44 (Oswald Dep.).

know, what—what is it that you can do? What can you provide because we don't have the experience with this type. And more or less, you know, it was formally asked, you know, can you advise us, can you tell us, you know, is this a good deal or is this the best option for us because we were trying to pursue what would be the best—financially the best course, not just get the bonds, but are those the bonds that we should indeed pursue.

Q. And you mentioned people were asking these questions. When you say people, do you mean Union County Board of Supervisors asked the question?

A. Yes.

. . .

A. I think it was supervisor King at the time asked—because we were asking different questions, you know, who do you work for because, quite frankly, that hadn't been made clear. And—and then Mr. Oswald said, well, I work—would work for you, the county. And different questions and so it was suggested that the specifics would be delineated as to what-what Mr. Oswald would do. So we would know what financial advice—so that we could rely upon someone for financial advice, so we could proceed.

. . .

Q. Did you leave that meeting knowing Mr. Oswald was going to write a letter to the Board or Mr. Kenyon?

A. That was the—again, the sum—how we brought it to a close amongst the five of us is—it might have been—I'm not sure who asked specifically said, you know, Mr. Oswald, can you put that in a letter so we know what you will be doing, what your responsibilities will be.

. . .

Q. No discussion after receiving the letter with regard to Mr. Oswald or his role?

A. I thought we had a financial adviser engaged to look after the county's interests in that matter.

Pl.'s App. at 711–17 (Reasoner Dep.).

Q. Do you have any independent recollection in December of 1996 of anybody on the board requesting that Mr. Oswald write a letter to Mr. Kenyon?

A. I don't know if there was a letter, but I do remember that Mr. King asked [Oswald] who he worked for. . . . I remember Mr. King was pretty emphatic about it. . . . And, you know, he said, well, just who do you work for and he said you. . . . And that' the one thing I do remember because it was just kind of emphatic, you know . . . . this is what I was alluding to before is when you asked me about Mr. Oswald and, to me, this was hiring a financial officer.

. . .

Q. Do you recall any conversation at the Union County Board of Supervisors meeting whereby this letter was discussed amongst the Union County Board of Supervisors?

A. No. I just—I just remember reading through these things. And it made you feel that we had hired an expert.

Pl.'s App. at 94–98 (Brown Dep.).

From Mr. King's question, it was clear that Mr. King wanted to know what Oswald's role was and who he was working for.

. . .

Q. What did Mr. Oswald say about the project, the overall project?

A. His response to Mr. King was I'm working for the county.

Q. Doing what?

A. Providing financial information and preparation for the project. They were connected with the bond responsibilities.... When there was question about the relationship between the county and Mr. Oswald, I noted that because I understood that they would have some business relationship with him.... I understood Mr. Oswald to indicate that he was working for the county. I cannot tell you what his exact words were. I understood that he was working for the county. That was the significance of the communication.

Pl.'s App. at 179–184 (Tim Kenyon Dep.).

The County further argues that the December 12, 1996 letter, which the County repeatedly characterizes as an "Engagement Agreement," reinforces the fact that, at the December 9, 1996 Board meeting, Piper agreed to act as the County's financial advisor with respect to the Development Agreement. While the County recognizes that the letter commences by articulating that Piper would be the "underwriter of the proposed debt," it claims that Piper went much further than that, stating that it would "represent the County as requested, in all aspects of completion of the financing"; "assist the County in the creation and completion of a development agreement"; "review the development agreement and recommend areas of concern and suggested strategy"; and "advise and assist in securing a municipal credit rating or credit enhancement insurance, if appropriate." Pl.'s Facts ¶ 27 (citing December 12, 1996 Letter). While the County also recognizes that Piper disclosed that it had been "retained by the Developer to provide financing," the County claims it had

no reason to believe this fact was of any concern because Piper twice "disclaimed any conflict in 'representing' the County on the 'financing.' " Pl.'s Br. at 8.

The Court accepts as true the testimony by Union County's Board Members that, on the basis of their discussion with Oswald at the December 9, 1996 meeting and the language of the December 12, 1996 letter, they *believed* they were employing Piper as the County's financial advisor. The question before the Court, however, is whether a reasonable jury could conclude from such evidence that Piper and the County had entered into a fiduciary relationship whereby Piper owed fiduciary obligations to the County due to its status as the County's "financial advisor" with respect to the Development Agreement.

▉▉▉ A fiduciary relationship will be found to exist between two parties " 'when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relationship.' " *Kurth v. Van Horn,* 380 N.W.2d 693, 695 (Iowa 1986) (quoting Restatement (Second) of Torts § 874, cmt. a, at 300 (1979)). Likewise, a fiduciary relationship may be found in situations where " 'confidence is reposed on one side, and domination and influence result on the other.... Such relationship exists when there is a reposing of faith, confidence and trust, and the placing of reliance by one upon the judgment and advice of another.' " *Id.* at 695–96 (quoting Black's Law Dictionary 564 (5th ed. 1979)). As stated by the Iowa Supreme Court:

[A] confidential relationship exists when one person has gained the confidence of another and purports to act or advise with the other's interest in mind.... The gist of the doctrine of confidential relationship is the presence of a dominant influence under which the act is presumed to have been done. The purpose of the doctrine is to defeat and

protect betrayals of trust and abuses of confidence.

*Wilson v. IBP, Inc.,* 558 N.W.2d 132, 138 (Iowa 1996) (quoting *Hoffman v. Nat'l Med. Enters., Inc.,* 442 N.W.2d 123, 125 (Iowa 1989)). Though some relationships are automatically considered fiduciary in nature, more often the relationship "must be evaluated on the facts and circumstances of each individual case." *Id.* at 696.

■■■■■ Factors to be considered in determining whether a fiduciary relationship exists include: 1) the acting of one person for another; 2) the having and exercising of influence over one person by another; 3) the reposing of confidence by one person in another; 4) the dominance of one person by another; 5) the inequality of the parties; and 6) the dependence of one person upon another. *See id.* (citing *First Bank of Wakeeney v. Moden,* 235 Kan. 260, 681 P.2d 11, 13 (1984) (per curiam)). Under Iowa law, the existence of a fiduciary duty "is 'ordinarily' a fact question, but when undisputed facts are insufficient to find a fiduciary relationship exists, the question may be resolved by the trial court as a matter of law." *Employers Mut. Cas. Co. v. Collins & Aikman Floorcoverings, Inc.,* 422 F.3d 776, 780 n. 2 (8th Cir.2005) (applying Iowa law).

Union County makes the following argument in support of its claim that a fiduciary relationship existed between the County and Piper with respect to the Development Agreement:

> Before the Development Agreement and County Notes, the County had issued only $500,000 in general obligation debt and had no experience with TIF financing or TIF projects. No County Supervisor or other County official involved had any experience in working in public finance, real estate finance or the corporate finance field. Oswald was aware that he held superior financing expertise and in securing engagement by the County, Oswald represented to the county that he was 'the best' in his field of municipal securities and that he would represent the county ("I work for you.") and provide advice to the county on the Development Agreement. The County asked questions of Piper and Piper provided financial advice, as Oswald admits. Oswald met with the County Board and County Assessor regarding the Development Agreement and sent correspondence to the County and the Ahlers firm regarding a variety of matters relating to the Development Agreement. Thus, the County looked to Piper to protect it under the Development Agreement (as the Engagement Agreement repeatedly assures the County). Moreover, Piper held itself out to the world as the County's "financial consultant." While the facts clearly establish that Piper acted (contrary to its 'underwriter-only mantra') as more than simply an underwriter to the county, at the bear [sic] minimum a fact question exists precluding [ ] summary judgment.

Pl.'s Resistance Br. at 35–36 (citations omitted).

1. *"Inequality of the parties."*

■■■■ There is generally no dispute in the record that the County Board members had limited or no experience with general obligation bond offerings, TIF financing, TIF projects, public finance, real estate finance or corporate finance.[33] There is, likewise, no dispute that Oswald

---

**33.** Union County repeatedly emphasizes that its Board Members were "all local citizens, elected or appointed to these positions from a small, rural community. None of the County Board, nor these other County officials at the time of the Development Agreement were trained or experienced in public finance." Pl.'s Br. at 5–6. While the Board Members' rural backgrounds and limited experience are

and Piper possessed superior knowledge on such issues, or that Piper was aware that Union County had lesser knowledge and experience than did Piper. *See* Def.'s Resp. to Pl.'s Facts ¶ 15 ("Admitted that Tim Oswald was aware that the county Supervisors did not have the expertise he had...."); ¶ 19 ("Admitted that Piper Jaffray has extensive expertise in municipal finance, superior to that of the County, and a good reputation."). Considering these facts, along with Board Member King's assertion that Oswald stated at the December 9, 1996 Board meeting, "I'm the best at the job I do,"[34] there is arguably an "inequality of the parties" with regard to general knowledge of public financing. While relevant, however, the mere fact that Piper had superior knowledge of public financing cannot, standing alone, sustain a legal finding that the parties were in a fiduciary relationship. *See Rajala v. Allied Corp.*, 919 F.2d 610, 624 (10th Cir. 1990) (concluding that mere fact that one party had "superior knowledge" regarding a particular component of a transaction was "not sufficient to give rise to a fiduciary obligation"); *Café La France, Inc. v. Schneider SEC, Inc.*, 281 F.Supp.2d 361, 373 (D.R.I.2003) (noting that while one party "held superior knowledge regarding the IPO process, and of course [the other party] relied on that knowledge. The same is true of any commercial relationship; however, were it otherwise each entity would be entirely self-sufficient."); *eToll, Inc. v. Elias/Savion Adver., Inc.*, 811 A.2d 10, 23 (Pa.Super.Ct.2002) ("This does not mean, however, that a fiduciary relationship arises merely because one party relies on and pays for the specialized skill or expertise of the other party. Otherwise, a fiduciary relationship would arise whenever one party had any marginally greater level of skill and expertise in a particular area than another party.")

2. *"Reposing of confidence"; "acting of one person for another"; "dominance of one person by another"; "having and exercising of influence over one person by another"; and "dependence of one person upon another"*[35]

In addition to its knowledge of Piper's superior experience in handling financial

not disputed, Union County's attempt to make its County Board members appear to have no knowledge whatsoever of the ins-and-outs of public finance ignores certain relevant considerations. As Piper points out, the County officials in this case were responsible for overseeing a budget of approximately $6.5 million in revenues, for determining tax rates and taxing citizens, and for balancing the public budget. Def.'s Resp. to Pl.'s Facts ¶ 11. Moreover, the County, including Board Members involved in the CF Processing matter, participated in the issuance of $500,000 in bond debt in 1982, which was refinanced and refunded in 1992. Def.'s Facts ¶ 18. The County also participated in several other public financing transactions, including a 1995 "pass-through grant," a 1991 Capital Loan Certificate Agreement, a joint financing agreement between six counties, an IDR issuance for $4.9 million, and acted as a guarantor on a 1987 loan from FmHA to the Southern Iowa Residential Facility. Def.'s Resp. to Pl.'s Facts ¶ 11. Board Member Bradley also offered testimony that the County Board Members sometimes attended two days of classes, put on by the Iowa State Association of Counties every spring and fall, wherein changes in the law and other issues relevant to county governance were discussed. *See* Def.'s Supp. App. at 23–24.

**34.** *See* Def.'s Resp. to Pl.'s Facts ¶ 20 (admitting that Board Member King testified that Oswald stated he was the "best at the job I do").

**35.** While Union County recites the factors that are often deemed indicia of a fiduciary relationship, *see* Pl.'s Br. at 33, its argument seemingly focuses only on the "inequality of the parties" and "the reposing of confidence by one person in another factors." *See* Pl.'s Br. at 33–36 (discussing the disparity of expertise between the parties and asserting that the County and Piper had a relationship

matters, Union County contends that it "reposed 'faith, confidence and trust' and placed reliance upon Piper's 'judgment and advice'" based on Oswald's comments at the December 9, 1996 Board Meeting. Indeed, the County relies extensively and almost exclusively on Oswald's "I work for you" comment at the December 9, 1996 Board meeting as supporting the creation of a fiduciary duty, coupled with King's deposition testimony that "Oswald told us [at the December 9, 1996 meeting] that he would be our financial officer, our financial person, that we did not have to worry about any of the financial. He would take care of all of that, the agreements, the whole nine yards." Pl.'s App. at 267–68. According to the County, the December 12, 1996 follow-up letter from Oswald to Kenyon "simply provides support for the existence of a fiduciary relationship." Pl.'s Br. at 34. The County argues that following the December 9, 1996 meeting and the receipt of the December 12, 1996 follow-up letter, it was satisfied that it had "hired Piper to provide financial advice ... to ensure the protection of the County's general obligation for debt service under the Development Agreement" and to protect the County in all aspects of the transaction. See Pl.'s Br. at 52. Accordingly, the County thereafter reposed its faith, confidence, and trust in Piper and, from that point on, appropriately relied on Piper's judgment and advice in deciding whether to enter into the Development Agreement.

"characterized by ongoing conduct in which the County reposed 'faith, confidence and trust' and placed reliance upon Piper's 'judgment and advice.'"). The County makes no direct argument regarding the other factors identified as indicia of a fiduciary relationship, failing to even discuss whether Piper "acted for" Union County, "exercised influence" over Union County, "had dominance" over Union County, or whether Union County actually "depended" on Piper to advise it with

a. *"I work for you" and the December 12, 1996 letter.*

The County contends that Oswald committed to act as its financial advisor at the December 9, 1996 meeting when Oswald informed the County Board Members "[i]f you hire me, I work for you." Pl.'s App. at 266. This comment alone is clearly insufficient to establish the existence of a fiduciary relationship. *See Employers Mut.*, 422 F.3d at 780 (finding that a salesman's statement that he would "work on EMC's behalf" to determine the cause of a carpet problem was a legally "insufficient basis upon which to find a fiduciary relationship"). The statement is not tied to the Development Agreement in any way, and does not give any indicia that a relationship of confidence was intended with respect thereto. Indeed, the statement is so amorphous on its face that no reasonable person could rely on it to believe that a fiduciary relationship, rather than an ordinary arms-length transaction, was to be undertaken.

Board Member King went on to testify, however, that Oswald "told us that he would be our financial officer, our financial person, that we did not have to worry about any of the financial. He would take care of all of that, the agreements, the whole nine yards." Pl.'s App. at 267–68. Were this the end of Oswald's representations to the County regarding the scope of the relationship, there would certainly be a jury question on whether a financial advisory relationship had been established be-

respect to the Development Agreement. The Court finds, however, that these indicia of a fiduciary relationship are closely related, if not inextricably intertwined. Accordingly, to the extent that Union County makes some argument about how the "facts and circumstances" in this case evidence a fiduciary relationship between the parties, the Court will consider such argument in the context of these factors.

tween the parties. This was not the end of communications, however. The parties all agree that the County Board Members requested that Oswald send a letter to the Union County Attorney, Tim Kenyon, outlining what Piper's expected role in the transaction would be, and that Oswald, in fact, sent such a letter on December 12, 1996.

While Piper contends that the December 12, 1996 letter dispels any reasonable belief by the County that Oswald was acting as its financial advisor, Union County argues that the December 12, 1996 letter supports its claim that Oswald agreed to be the County's financial advisor. From the outset, the Court notes that there are significant problems with the County's argument in this regard. The first problem is that the very first line of the letter expressly states, not that Oswald will be the County's financial advisor, but that Piper "will be assisting the County *as the underwriter of the proposed debt.*" Def.'s App. at 233. As noted previously, it is well-accepted that underwriters generally owe no duty to the issuer of securities. *See* Fippinger, *supra* ("[T]he underwriting agreement is drafted to provide that the underwriter is acting as a principal in an arm's-length relationship with the [issuer]. No issuer of municipal securities ... should be under the misunderstanding that an underwriter is an employee or agent of the issuer.").

The second problem is that Piper additionally states in the letter: "As you are aware, we have been retained by the Developer to provide financing of the proposed project." Def.'s App. at 233. This disclosure arguably undercuts the exis-

tence of a fiduciary relationship.[36] *See* Def.'s Br. at 16 (collecting cases supporting a conclusion that no fiduciary relationship exists where a conflicting duty is disclosed); *In re Mushroom Transp. Co., Inc.,* 382 F.3d 325, 347 (3d Cir.2004) (declining to find a fiduciary relationship where to do so would create potential "irreconcilable obligations"); *S. Minn. Mun. Power Agency v. City of St. Peter,* 433 N.W.2d 463, 468 (Minn.Ct.App.1988) ("A fiduciary relationship is not established ... by plaintiff merely having faith and confidence in defendant where plaintiff should have known defendant was representing an adverse interest.") (citing *Kennedy v. Flo–Tronics, Inc.,* 274 Minn. 327, 143 N.W.2d 827, 830 (1966)); *Walter v. Holiday Inns, Inc.,* 784 F.Supp. 1159, 1168–69 (D.N.J.1992) (discussing the "adverse interest" exception providing that the trust and reliance elements of a fiduciary obligation are lacking when it is apparent that one party may have adverse interests). Union County counters, however, that Piper's disclosure of a potentially adverse relationship had no import because Piper goes on to disclaim any conflict, stating, "We do not believe this causes us a conflict of interest in assisting the County." *See* Pl.'s Br. at 8 ("Piper disclaimed any conflict in 'representing' the County on the 'financing,' here informing the County it had no conflict in 'representing the County as requested' (not that it could not represent the County, as Piper conveniently contends now in hindsight)"). The County's interpretation, however, totally ignores the *reason* Piper gives for believing no conflict exists,

---

**36.** Piper argues that the disclosure of an adverse relationship is, alone, sufficient to show that no breach of fiduciary duty existed. In the proper factual setting, the Court agrees that disclosure of a conflict could do precisely that. In this case, however, the disclosure must be viewed in the context of the entire December 12, 1996 letter and other evidence in the case. As discussed *infra,* it is for the jury to determine what import to give the various disclosures and disclaimers in that letter, given the potentially conflicting language in the "bullet points" of the letter.

namely, "We do not believe that this cause us a conflict of interest in *assisting* the County, however, *because the only area of possible conflict is in the actual development agreement* and the *agreement is drafted and negotiated between the County's attorney and the developer's attorney.*" Def.'s App. at 233 (emphasis added). Moreover, Piper goes on to emphasize the limited role it will play in the transaction, stating, "The underwriting of debt securities is a special and small portion of the overall project, and *our services are to be limited to the structuring and sale of securities.*" *Id.* (emphasis added).

Despite the clearly worded provision disclaiming any responsibility for drafting and negotiating the Development Agreement, and despite the provision stating that Piper would act as the "underwriter of the proposed debt" and expressly limiting Piper's role to the "structuring and sale of securities," Union County nonetheless maintains that, on the second page of the letter, Piper "plainly told the County Board here that it was not representing CF but only the County on the financial aspects of the Development Agreement and 'regarding financial matters.'" Pl.'s Br. at 8. The second page of the December 12, 1996 letter provides:

> The Supervisors have requested that we assist in the development agreement to provide analysis of the proposed minimum assessment and timing of the minimum assessment, and in calculating the amount to be offered the developer.

> We are comfortable with this responsibility and will covenant not to participate in assisting the developer in negotiating the agreement. As the above noted items are the major points of *financial interest* to the county or any municipality doing a similar type of agreement, these are the only items we would generally advise an issuer regarding. We are comfortable that the County will be adequately represented regarding financial matters.

Def.'s App. at 234. The Court finds that the County's interpretation is little more than "selective reading." The plain language states that, while Piper is agreeing not to help the Developer negotiate the Development Agreement, it is only assisting the *issuer* (the County) with the specific items noted in the first paragraph. Indeed, Piper specifically notes that such items ("provide analysis of the proposed minimum assessment and timing of the minimum assessment, and in calculating the amount to be offered to the developer") "*are the only items we would generally advise an insurer regarding,*" thus again disclaiming an advisory relationship as to any other aspect of the Development Agreement.

■ Given Piper's statements in the letter that it would be acting as an underwriter and that it would be involved in the overall deal in only limited ways, the County will likely have an uphill battle in proving the existence of any duty owed to it by Piper. The problem for Piper on its Motion for Summary Judgment, however, is that Piper did not *only* make clear statements about what it would and would not be doing for the County. The existence of a fiduciary relationship is not circumscribed by labels the parties attach to the relationship; rather, its existence depends on the specific facts and circumstances of a case. Here, the County discounts Piper's statement that it would act as "underwriter" and in only a limited capacity, arguing that the facts and circumstances point to a fiduciary relationship. Specifically, the County points out that, after stating it will act as an "underwriter," Piper goes on to state in the bulleted points of the letter that it will perform a variety of financial advisory services, including: 1) "We will attend meeting and *represent the County as requested, in all aspects of the completion of the financing;*" 2) "*assist the*

*County in the creation and completion of a development agreement*" 3) "*review the development agreement and recommend areas of concern and suggested strategy; and 4) advise and assist in securing . . . credit enhancement insurance,* if appropriate."[37] *See* Pl.'s Br. at 7 (emphasis in original).[38]

 According to the County, Oswald confirmed in these bullet points what the County already believed, i.e., that Piper would advise the County on all aspects of completing the Development Agreement, including the propriety of any such Agreement and ways in which the County could protect itself from harm. After careful review of the letter, the Court finds that while the County has unquestionably undertaken a selective reading of the December 12, 1996 letter, so too has Piper. Piper's repeated assertion that the plain language of the document unquestionably shows that it was disclaiming any financial advisory relationship fails to account for the broader statements it made in the bullet points referenced above, particularly those where Piper states that it will "assist the County in the *creation and completion* of a development agreement," and "review the development agreement and recommend areas of concern and suggested strategy." Considering the letter as a whole, the Court finds that it at least presents a jury question on whether Piper undertook any duty, fiduciary or otherwise, to advise the County with respect to the Development Agreement, particularly when read in conjunction with Oswald's representations to the County that he would "be [the County's] financial officer, our financial person, that we did not have to worry about any of the financial. He would take care of all of that, the agreements, the whole nine yards." Pl.'s App. at 267–68.

b. *Union County's reposing of confidence in Piper.*

 The Court recognizes that "the reposing of confidence in one person by another" is a relevant consideration in examining whether a fiduciary relationship exists, and will accept as true Union County's assertion that it, in fact, "reposed confidence" in Piper (based on Oswald's "I work for you" statement) to advise it regarding the Development Agreement. Indeed, the testimony by the various County Board members cannot be ignored, and each has offered some testimony that they were relying on Piper to advise it on any concerns or risks associated with the Development Agreement, as structured. "[C]ourts have repeatedly cautioned," however, "that 'the plaintiff alone, by reposing trust and confidence in the defendant, cannot thereby transform a business relationship into one which is fiduciary in nature.'" *Gemini Investors, Inc. v. Ches-Mont Disposal, LLC,* 629 F.Supp.2d 163, 168 (D.Mass.2009) (quoting *Superior Glass Co. v. First Bristol Cnty. Nat'l Bank,* 380

37. The County argues that recent "financial Advisory Services Agreements" Piper had with other local governments "belie Piper's position that it was serving solely as the County's underwriter under the Engagement Agreement." While there are some similarities between the language of prior Financial Services Agreements by Piper and the bulleted language in the December 12, 1996 letter, there are also striking dissimilarities, namely the fact that the Financial Advisory Services Agreement all commence by stating that the services provided shall be to offer "*advice* and assistance" in various areas. *See* Pl.'s App. at 2152–67. In any event, the Court finds that these documents have little, if any, relevance to the present proceedings where the issue is whether a fiduciary relationship existed *between Union County and Piper,* absent some assertion that Union County was aware of these agreements and relied on them in reposing its trust in Piper.

38. The County used underlining to emphasize these provisions, which the Court has expressed through the use of italics.

Mass. 829, 406 N.E.2d 672, 674 (1980) (other quotations and citations omitted)); *see also Hotmar v. Lowell H. Listrom & Co., Inc.,* 808 F.2d 1384, 1387 & n. 2 (10th Cir.1987) (affirming grant of summary judgment under Kansas law and finding that "one may not unilaterally impose a fiduciary relationship on another without a conscious assumption of such duties by the one sought to be held liable as a fiduciary"); *Hunter v. Jackson Hewitt, Inc.,* No. 3:06–0919, 2007 WL 3376841, at *6 (S.D.W.Va. Nov. 6, 2007) ("Generally, 'a fiduciary relationship is established only when it is shown that the confidence reposed by one person was actually accepted by the other, and merely reposing confidence in another may not, of itself, create the relationship.'" (citations omitted)). Though Iowa courts have not directly stated that there must be "acceptance" of the confidence reposed, they have clearly indicated that the party alleged to owe fiduciary duties must have some awareness or knowledge of the existence of a fiduciary relationship, or otherwise do something to demonstrate assent thereto. *See, e.g., Kurth,* 380 N.W.2d at 698 ("We believe in this case that the record fails to show substantial evidence that the customer relied upon the bank for advice in connection with this transaction or that, even if such reliance was placed in the bank, the bank was aware of it."); *Pender State Bank v. Remington,* No. 08–1799, 2009 WL 3775094, at *4 (Iowa Ct.App. Nov. 12, 2009) (affirming grant of summary judgment on issue of existence of fiduciary relationship, in part, on the basis that "[t]here was no evidence to show Koerselman knew Harriett was relying on him in making her decision to sign the docu-

ments"); *Irons v. Comm. State Bank,* 461 N.W.2d 849, 852 (Iowa Ct.App.1990) ("The Irons apparently feel because they reposed some trust in the bank, a fiduciary relationship was created. However, not only does the record fail to show a fiduciary relationship based on the facts, but also there is no evidence the bank ever assented to or was aware of a fiduciary relationship."). Upon reviewing Iowa case law, it is clear that such "assent" or "knowledge" is ordinarily demonstrated by proof that the reposing of confidence and trust on the one side *resulted* in dominance and influence on the other side.[39] *See Hoffman,* 442 N.W.2d at 126 ("A 'fiduciary relation' arises whenever confidence is reposed on one side, and domination and influence result on the other."); *First Nat'l Bank in Sioux City v. Curran,* 206 N.W.2d 317, 324 (Iowa 1973) ("By virtue of the reposed confidence itself, the recipient of the transfer has influence he would not possess if the two individuals were at arm's length."); *Utterback v. Hollingsworth,* 208 Iowa 300, 225 N.W. 419, 421 (Iowa 1929) ("It is prerequisite to the application of the doctrine that faith and confidence be reposed; that the repository shall be thereby in a position of superiority and dominance.").

In the present case, there is minimal evidence that Piper had "dominance" over Union County or that Piper "ha[d] and exercis[ed] influence" over Union County with respect to the Development Agreement. Union County attempts to demonstrate Piper's influence and dominance in two ways. First, it asserts that Oswald promised to "provide advice to the County on the Development Agreement," relying on King's testimony and the December 9, 1996 letter as support.[40] Second, Union

---

**39.** The Court believes that evidence of "assent" or "knowledge" focuses, at least to some extent, on whether the facts and circumstances made it reasonable for one party to have reposed its confidence and trust in the

other. As with most questions of reasonableness, however, this would inherently be a jury issue.

**40.** Union County does additionally point to the fact that the Official Statement related to

County posits evidence that purportedly shows that Piper did, in fact, act as Union County's financial advisor on the Development Agreement. According to Union County, Oswald received and commented on drafts of the Development Agreement, and "sent correspondence to the county and the Ahlers firm regarding a variety of matters relating to the Development Agreement. Thus, the County looked to Piper to protect it under the Development Agreement." Pl.'s Br. at 35. Union County cites specifically to two letters written by Oswald. In the first, a letter Oswald wrote to John McKinney at Ahlers Law Firm on December 10, 1996, Oswald writes: "The Board of Supervisors have instructed us to begin working with you on the process to complete a development agreement and sell G.O. notes." Def.'s App. at 221. In the second, a letter Oswald wrote to Mark Cory on February 28, 1997, Oswald states that he assumes that certain comments by the developer's attorney are not substantive "with respect to . . . the County's obligations," notes that the next step is to hold a public hearing, and advises that "[o]nce the hearing has been held, it would be appropriate to approve and execute the development agreement." Def.'s App. at 236.

Union County additionally cites a letter from Oswald to the County Board dated July 17, 1997. Def.'s App. at 287. In this letter, Oswald notes that Crosser received word from his bank that the bank would guaranty IDR bonds that were to be issued in relation to the Development Project. *Id.* Oswald notes that he had asked the County to "hold up moving forward with the $4 million cash grant, the develop-

ment agreement and the proposed bonding until [Crosser] could confirm that this piece of business had been completed," and suggests that "[n]ow that it is moving forward, it is time to pick up your process and move it forward," noting that things were one-month behind schedule from a timeline previously prepared. *Id.* Oswald further comments that he visited with Crosser "about completing the process with Audrey to allow for approval of the development agreement. I understand that he is working with Audrey in this regard. We should try and have approval of this document as soon as all of the pieces are filled in." *Id.*

The citations [41] Union County offers in support of its assertion that its reposing of confidence in Piper correlated to an exercise of influence or dominance by Piper provide extremely thin support for its desired conclusion. Although Oswald's letter to McKinney references that Piper will work with Ahlers "on the process to complete a development agreement," it also can be read as an attempt by Oswald to distance himself from involvement in the Development Agreement, stating only that it will "be between CF Processing L.C. and the County, and will call for a minimum assessment as of January 1, 1997 of $12 million. I'm not sure what other items you need for the agreement, so I'll let you contact me." *Id.* To the extent that Oswald's letter to Cory can be read as "advising" the County to execute the Development Agreement, it can also be read as evidencing that Oswald was not directly privy to the ongoing negotiations regarding the Development Agreement. The de-

the 1997 bond offering listed Piper as "Financial Consultant."

**41.** Union County incorrectly cites to its own appendix as containing these documents, though they actually appear on the referenced

pages in Piper's Appendix. The Court notes that, throughout its pleadings, Union County makes frequent and repeated citation errors such as this, a fact that has caused the Court substantial additional difficulty in evaluating an already complicated and lengthy record.

termination of whether these documents, in conjunction with Oswald's December 9, 1996 representations and December 12, 1996 letter, support a finding of that Piper

owed certain duties to the County, however, is precisely the type of weighing of the evidence that falls squarely within the province of a jury.[42],[43]

**42.** Piper additionally argues that the County's fiduciary relationship claim is "squarely defeat[ed"] by the fact that the County signed Loan Agreements with Piper that stated that Piper and the County "represent and agree that no financial advisory relationship as defined by Rule G–23 of the [MSRB] has existed between them with respect to this Loan Agreement or presently exists between them with respect to other similar matters...." The Court is not convinced that a disclaimer of a financial advisory relationship "with respect to *this Loan Agreement*" clearly demonstrates that Piper did not provide advisory services to the County with respect to the *Development Agreement.*

**43.** Piper also argues that Ahlers and Pechacek both had special knowledge and an ability to advise the County that was at least equivalent to Piper's ability. Indeed, there is substantial evidence in the record revealing that Union County's own attorneys actually negotiated, drafted, and made changes to the Development Agreement, and rendered various advice in response to questions asked by the County and concerns expressed by the County. *See* Def.'s Facts ¶ 63 (McKinney began billing time to County in August 1996); ¶ 75 (Pechacek employed by County); ¶ 116 (Cory negotiated the Development Agreement and prepared it); ¶ 118 (County Assessor met directly with Crosser to request information to form a decision regarding the Minimum Assessment Agreement); ¶ 120 (County Attorney aided County Assessor in compiling information to address areas of concern); ¶ 121 (County Assessor met with Crosser regarding calculation of Minimum Assessment) ¶ 122 (Ahlers prepared, revised, and circulated at least six drafts of the Development Agreement); ¶ 125 (County Assessor discussed with Pechacek "what happens if the amount of levy drops such that the assessment agreement does not produce enough taxes to cover the local government outlay"); ¶ 127 (after obtaining Crestland's guarantee, Cory suggested modifying Development Agreement to provide for "joint and several" responsibilities); ¶ 140 (Tim Kenyon wrote a letter on October 6, 1997 stating, "If the Board chooses to go forward, we should closely follow the recommendations of bond counsel"); ¶ 142 (Tim

Kenyon wrote a letter to county Board stating that he had reviewed the Development Agreement, knew of "no legal objections" to it, and that the "final decision to proceed" rests with the Supervisors); Def.'s App. at 1697 (Tim Kenyon testifying that he did not discuss the development agreement with Oswald).

There is further significant evidence that at least some of the information the County claims Piper failed to disclose was also in the knowledge of the County's counsel, Ahlers. *See In re Land*, 215 B.R. 398, 404 (8th Cir. 1997) ("The rule in Iowa is that knowledge acquired by an agent before the commencement of the relationship of principal and agent is imputable to the principal if the knowledge is present in the mind of the agent while acting for the principal in a transaction to which the information is material.") (citing *Curran Hydraulic Corp. v. Nat'l–Ben Franklin Ins. Co. of Ill.*, 261 N.W.2d 822, 826 (Iowa 1978)); *see* Def.'s Facts ¶ 28 ("The Ahlers Firm, as Issuer's counsel for the IDR issuance, received and reviewed all of the same correspondence, draft disclosure documents, and financial information Piper Jaffray had access to as underwriter of the IDR issuance."); Pl.'s Resp. to Def.'s Facts ¶ 28 (qualifying the asserted fact to note that attorney Kniep, who testified to receiving a copy of the "limited offering memorandum" would only have reviewed it "with any eye toward ensuring that ... the bonds were not general obligations of the City of Creston"). The precise role of the various attorneys involved in this transaction, however, is disputed. While the County makes every effort to argue that these attorneys had extremely limited roles, Piper contends that they were extremely involved and that it is clear that they were actually advising the County. While Piper may ultimately be correct in its assertion that any "missing" knowledge of the County is actually imputed to the County because the County's attorneys knew about it, the Court is simply not clear on precisely what the lawyers knew, when they knew it, and whether their information was the same or different than what Piper knew, particularly in the context of the entire Development Project.

The Court believes that Union County's evidence of duty is quite weak, and it is not confident that Union County can successfully make out a claim, at trial, that Piper owed it fiduciary duties. The mere fact that the Court has doubts, however, even serious doubts, is insufficient to warrant summary judgment. Issues of duty are fact-intensive and the parties here contest and dispute virtually every relevant fact. While it is clear that Oswald took an overall approach whereby he was shepherding all the players, and certainly Union County, through the process, the Court is simply not convinced, despite extensive review of the record, that Oswald did not actually go beyond the "role" of underwriter and undertake some additional duty to the County. Accordingly, the appropriate course to follow at this point in time is to permit the case to proceed forward and let a jury make these factual determinations.

E. *Count Three—Negligent Misrepresentation and Count Four—Negligence: Did Piper owe the County a duty of care with respect to the Development Agreement?*

As with a claim for breach of fiduciary duty, the County must demonstrate that Piper owed it some "duty" to render it advice *with respect to the Development Agreement,* before it can succeed on its claim for negligence or negligent misrepresentation. *See Stotts v. Eveleth,* 688 N.W.2d 803, 807 (Iowa 2004) (noting that the question of whether a legal duty exists, as required to prove a claim of negligence, is a legal issue for the court to resolve); *Sain v. Cedar Rapids Comm. Sch. Dist.,* 626 N.W.2d 115, 124 (Iowa 2001) ("As with all negligence actions, an essential element of negligent misrepresentation is that the

defendant must owe a duty of care to the plaintiff...."); *Jensen v. Sattler,* 696 N.W.2d 582, 588 (Iowa 2005) ("Absent a special relationship giving rise to a duty of care, a [claimant] cannot establish negligent misrepresentation.").

1. *Negligence.*

■■■ With respect to the County's claim of negligence, any duty owed by Piper to the County is necessarily "defined by the relationship between the individuals." *Sankey v. Richenberger,* 456 N.W.2d 206, 209 (Iowa 1990). In determining whether a legal duty exists, the Court is guided by consideration of three factors: 1) the relationship between the parties; 2) the reasonable foreseeability of the harm to the person who is injured; and 3) public policy considerations. *See Leonard v. State,* 491 N.W.2d 508, 509–12 (Iowa 1992). Iowa courts additionally look to "legislative enactments, prior judicial decisions, and general legal principles as source for the existence of a duty." *Van Essen v. McCormick Enter. Co.,* 599 N.W.2d 716, 718–19 (Iowa 1999). In this case, the primary duty the County alleges Piper owed it is the alleged fiduciary duty discussed above, i.e., that Piper agreed to act as the County's financial advisor and thereby owed it certain duties of disclosure. The County, however, also argues that Piper owes duties to the County as an underwriter. *See* Piper's Br. at 45. Specifically, the County asserts that Piper was under an obligation to disclose to the County material information that it possessed, because the Iowa Supreme Court "has recognized disclosure duties in transactional relationships that are not strictly fiduciary in nature but involve disparity of knowledge."[44]

**44.** Piper argues that Plaintiffs' negligence claim is duplicative of its claim for breach of fiduciary duty because Plaintiff does not allege any duty, other than the claimed fiduciary duty, existed or was breached. The Court rejects Piper's proposition in this regard. The

County has asserted that Piper owed it a duty, under the particular facts and circumstances of this case, to disclose relevant information regardless of whether it was acting as a financial advisor or as an underwriter. Notably,

*Id.*

The Iowa cases that the County refers to rely on § 551(2)(b) of the Restatement (Second) of Torts, which provides that "[o]ne party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated ... matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading." In this case, the County contends that Piper had a duty to disclose information in its possession to prevent various information Piper provided from being misleading, such as: 1) Piper's representation that Oswald "only" represented the County; 2) Piper's representations regarding the availability of an LOC, and 3) "facts basic to the transaction." For the same reasons discussed above, in the context of whether Piper and the County had a fiduciary relationship, the Court finds that these inquiries require a weighing of the evidence such that a jury should properly determine whether Piper owed the County any duties.

### 2. *Negligent misrepresentation.*

█ With respect to the County's claim of negligent misrepresentation, Plaintiff must show that any purported duty arose from a relationship whereby "information is provided by persons in the business or profession of supplying information to others." *Sain,* 626 N.W.2d at 124 (citing *Hendricks v. Great Plains Supply Co.,* 609 N.W.2d 486, 492 (Iowa 2000)). Thus, in determining whether a duty of care arises in this case, the Court must "distinguish between those transactions where a defendant is in the business or profession of supplying information to others from those transactions that are arm's length and adversarial." *Id.* (citing *Molo*

*Oil Co.,* 578 N.W.2d at 227). "The facts to support the tort ... have traditionally arisen only in the context of commercial transactions." *Id.* at 125.

█ The Court determines whether Piper was in the business or profession of supplying information to others as a matter of law. *Fry v. Mount,* 554 N.W.2d 263, 265 (Iowa 1996). In so doing, the Court evaluates several factors: 1) whether there is a "special relationship" between Piper and Union County; 2) whether Piper was acting in an advisory capacity such that it should have been manifestly aware of the use to which Union County would put the information, and whether Piper intended to supply the information for that purpose; 3) whether Piper had a pecuniary interest; and 4) whether Piper supplied information to Union county gratuitously or incident to other more central functions or services. *Sain,* 626 N.W.2d at 124. Here, Piper is unquestionably an entity that is in the business or profession of supplying information to others and, indeed, offers financial advice amongst one of its many available services. Whether Piper was engaged in a "financial advisory" role or in an pure arm's length "underwriter" role, however, is not a question the Court can resolve as a matter of law at this point in the proceedings, as discussed extensively *supra.* Thus, to the extent that Union County can convince a jury that Piper undertook a duty to advise it with respect to the Development Agreement, the Court finds Piper was in the business or profession of supplying information to others as a matter of law. If, however, the jury were to conclude that Piper owed no duty, fiduciary or otherwise, and was acting merely as the County's underwriter, then this element of the

even if Plaintiff were successful in proving the various theories of recovery at trial, Plaintiff

would not be permitted to obtain duplicative damages in any event.

negligent misrepresentation claim would also necessarily fail.[45],[46]

### F. Count Two—Breach of Contract: Did Piper Owe Contractual Duties to Union County?

The Complaint in this case alleges that, "pursuant to the [December 12, 1996 letter] and their other representations about the nature and scope of the services to be provided to the County, the Piper Defendants contracted to provide the County with certain counseling and underwriting services regarding the issuance of the Notes." Compl. ¶ 56. The Complaint goes on to allege that the Defendant "breached the [December 12, 1996 letter] (and their other representations to the County about the nature of the representation of the County)," that the County " 'performed all of its obligations,' and that the County was damaged by Piper's breach of the [December 12, 1996 letter]

and other commitments." Id. ¶¶ 57–59. Piper contends that Plaintiff cannot succeed on its claim for breach of contract because there was no contractual relationship between the parties based on either the December 9, 1996 meeting or the December 12, 1996 letter. The County, on the other hand, contends that its breach of contract claim is "straightforward":

> Piper appeared at the December 9, 1996 Board of Supervisors meeting to discuss the County's financing of the CF project, and when the County questioned Piper about who it was representing if the County moved forward, Oswald responded, "[Piper] will be the county's financial officer to do this project ... I work for you." Then retained, Piper directed bond counsel to work with Piper "to complete a development agreement" and sent the County Board the Engagement Agreement. It also disclaimed any conflict with and representation of

---

**45.** Moreover, the Court notes that, regardless of whether Piper was or was not acting as the County's financial advisor, it did, under any reading of the December 12, 1996 letter, agree to "assist in the development agreement" to provide certain specific functions, i.e., "analysis of the proposed minimum assessment and timing of the minimum assessment, and in calculating the amount to be offered the developer." With respect to these particular tasks, the County specifically alleges that Piper failed to inform it that Piper believed a "$19 million assessment on the CF project was 'high.' " See Pl.'s Br. at 19. While Piper contends it had no obligation to so inform the County, a reasonable jury could certainly conclude otherwise on the facts of the facts and circumstances in this case.

**46.** Piper also argues that there "is no support under Iowa law for the proposition that alleged failure to provide information constitutes a 'false' statement for purposes of a negligent misrepresentation claim," quoting this Court's opinion in Merriam v. Nat'l Union Fire Insurance Co., 580 F.Supp.2d 838, 861 n. 39 (S.D.Iowa 2008). Piper ignores, however, that in Merriam, the Court noted simply that

Iowa law was not clear, and presumed for purposes of the summary judgment motion under consideration that "an allegation of omission is akin to an allegation of affirmatively providing false information." See id. (comparing Breeden v. Richmond Comm. Coll., 171 F.R.D. 189, 194 (M.D.N.C.1997) (finding that "concealment or nondisclosure may be considered akin to a positive misrepresentation") with Sergeant Oil & Gas Co., Inc. v. Nat'l Maintenance, 861 F.Supp. 1351, 1360 (S.D.Tex.1994) (finding no "supplying" of false information sufficient to support a negligent misrepresentation claim where the allegation was simply one that material information was not disclosed)). For the reasons stated in Merriam, the Court will make the same presumption in the present case.

Piper makes additional argument about the deficiency of the County's misrepresentation claims, raising for the first time in its Reply brief additional, specific argument about their legal sufficiency. See Def.'s Reply Br. at 11–16. The Court declines to address arguments raised for the first time in a Reply Brief. See United States v. Vincent, 167 F.3d 428, 432 (8th Cir.1999) (arguments raised for first time in reply need not be addressed).

CF, and assured the County, "We are comfortable the County will be adequately represented regarding financial matters." It then, from all County appearances, began to perform its engagement by the County, charging the County $143,325 for its work on financial advising on the Development Agreement and then underwriting the notes.

Pl.'s Br. at 37–38.

 As previously noted, to succeed on its claim for breach of contract, Plaintiff must first demonstrate the existence of a valid contract. *See Molo Oil Co.*, 578 N.W.2d at 224. "It is fundamental that a valid contract must consist of an offer, acceptance, and consideration." *Margeson v. Artis*, 776 N.W.2d 652, 655 (Iowa 2009) (citing *Taggart v. Drake Univ.*, 549 N.W.2d 796, 800 (Iowa 1996)). The County does not address any of these fundamental requirements for a contract. Nonetheless, it appears from the above language that the County is making two alternative arguments: 1) that a contract was formed at the December 9, 1996 meeting; or 2) that the December 12, 1996 letter is a contract. Both of these arguments fail as a matter of law.

 "All contracts must contain mutual assent." *Magnusson Agency v. Pub. Entity Nat'l Co.–Midwest*, 560 N.W.2d 20, 26 (Iowa 1997) (citing *Anderson v. Douglas & Lomason Co.*, 540 N.W.2d 277, 285 (Iowa 1995)). "This assent is usually given through an offer and acceptance." *Id.* "An offer is a 'manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'" *Id.* (quoting *Anderson*, 540 N.W.2d at 285); *see also Heartland Exp., Inc. v. Terry*, 631 N.W.2d 260, 268 (Iowa 2001) ("The test for an offer is whether it induces a reasonable belief in the recipient that the recipient can, by accepting, bind the sender." (cita-

tions omitted)). The existence of an "offer" must be determined objectively, not subjectively. *Id.* "[I]f an offer is indefinite, there is not intent to be bound." *Anderson*, 540 N.W.2d at 286.

 With respect to the County's assertion that a contract was formed at the December 9, 1996 meeting, the County's evidence on this issue is simply the following testimony by Board Member King: "I said who do you work for. And he said, you. If you hire me, I work for you.... Mr. Oswald told us that he would be our financial officer, our financial person, that we did not have to worry about any of the financial." Pl.'s App. at 266–268. According to the County, after this exchange, Piper was "[t]hen retained," and he set to work as evidenced by the letter he sent to Ahlers on December 10, 1996. Pl.'s Br. at 38. Neither an offer nor an acceptance is discernible from this exchange. Even if King asking Oswald who he worked for could be deemed an offer, Oswald's response was merely an answer to an inquiry, not an assent to be bound. Likewise, even if Oswald's statement, "If you hire me, I work for you" could be construed as an offer, there is no evidence at all that the County actually accepted it.

With respect to the December 12, 1996 letter, the County also seemingly contends that it is a contract. Again, however, there is no mutual assent discernible on the record. If the December 12, 1996 letter is construed as an offer to provide services (regardless of the nature of those services), the County has not pointed to any evidence that would support a conclusion that the County actually accepted it. While the County argues that "from all County appearances, [Piper] began to perform its engagement by the County," performance by Piper is of no assistance to the County in proving contract formation. That is, if the December 12, 1996 letter is

considered an offer by Piper to render services to the County, performance could only constitute acceptance if such performance were made *by the County*, not by Piper. *See Anderson*, 540 N.W.2d at 283 ("A unilateral contract consists of an offeror making a promise and an *offeree rendering some performance* as acceptance." (emphasis added)). Finally, to the extent that the County *may* seek to claim that the December 12, 1996 letter is an acceptance of some offer made to Piper by the County at the December 9, 1996 meeting, such a claim would also fail because the County has not identified any words spoken by anyone representing the County at the December 9, 1996 meeting that could arguably qualify as an offer.

G. *Counts Three and Five—Negligent Misrepresentation and Fraud: Justifiable Reliance.*

Union County's claims of negligent misrepresentation and fraud both require it to demonstrate that Union County actually relied to its detriment on Piper's misrepresentations, and that any such reliance was "justifiable." *See Pollmann v. Belle Plaine Livestock Auction, Inc.*, 567 N.W.2d 405, 409–10 (Iowa 1997) ("The tort of negligent misrepresentation requires proof that the plaintiff justifiably relied on the representation made by the defendant."); *Midwest Home Distributor, Inc. v. Domco Indus.*, 585 N.W.2d 735, 743 (Iowa 1998) ("[J]ustifiable reliance is an essential element of fraudulent misrepresentation."). " 'Reliance upon [a defendant's representation] is justifiable if a person acting with reasonable and ordinary prudence and caution would have a right to rely on the representations.' " *Pollmann*, 567 N.W.2d at 410 (quoting *Kaiser Agric. Chems. v. Ottumwa Prod. Credit Ass'n*, 428 N.W.2d 681, 683 (Iowa Ct.App.1988)). "Reliance is not justified if the person receiving the information knows or in the exercise of ordinary care

should know that the information is false." *Pollmann*, 567 N.W.2d at 410.

"The justifiable-reliance standard does not mean a plaintiff can blindly rely on a representation." *Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 737 (Iowa 2009) (citing *Lockard v. Carson*, 287 N.W.2d 871, 878 (Iowa 1980)). "Instead, the standard requires plaintiffs to utilize their abilities to observe the obvious, and the entire context of the transaction is considered to determine if the justifiable-reliance element is met." *Id.* (citations omitted). Relevant factors in the consideration include:

> "(1) the sophistication and expertise of the plaintiff in financial ... matters; (2) the existence of long-standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the ... transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations."

*Id.* (quoting *Davidson v. Wilson*, 973 F.2d 1391, 1400 (8th Cir.1992)). Another relevant consideration is whether the "oral representation clearly contradicts a written agreement. In such instances, reliance on the oral representation by a plaintiff can be utterly unjustified in the face of a clear written contradiction." *Id.* (citations omitted).

In this case, the Court agrees with Piper that the County's case is extremely weak. There is substantial evidence in the record that much of the information Piper allegedly failed to disclose was accessible to the County Board Members in other ways, whether through local news media, other attorneys involved in the case, or by virtue of the numerous community meetings held on the Development Project generally. Indeed, the overall impression given by

the record is that the County failed to pay any attention whatsoever, or to conduct any investigation of its own, into any consideration that would tend to indicate whether the Development Agreement was a good or a bad idea, or a risky or non-risky investment of County resources. The position of the County, however, is that it was Piper's job to inform the County of any concerns or problems and that it was reasonable to rely on a "financial advisor" to do just that. Where, as here, the claim is essentially that Piper should have, but did not, advise the County on important aspects of a deal that could impact the County financially, the Court is not inclined to find, as a matter of law, that the County did not justifiably rely on Piper simply because it did not undertake to duplicate financial advisory services by searching for "red flags" on its own.

■ The justifiable reliance standard is not a general "reasonableness" standard. Indeed, for reliance to be justified, it "does not necessarily need to conform to the standard of a reasonably prudent person, but depends on the qualities and characteristics of the particular plaintiff and the specific surrounding circumstances." *Spreitzer*, 779 N.W.2d at 737. In this case, the County's inexperience and lack of sophistication with regard to financial transactions such as the one in issue, and the fact that Piper unquestionably had access to relevant information while the County's access and knowledge is the subject of fierce debate, weigh in favor of justifiable reliance. Naturally, the fact that the County arguably had access to much of the claimed relevant information would weigh against a finding that any reliance was justified, along with the facts that the parties had no prior relationship and the fact that Piper did not affirmative-

ly "conceal" any information. Consideration of all of the information the parties have put forth, however, about what County knew or should have known requires determinations of credibility and an extensive weighing of the evidence. Ultimately, it will be the jury's task to consider all of this evidence in determining whether the County justifiably relied on Piper to give it advice, and if it did, whether the County was justified in relying on Piper's silence.

## H. *Economic Loss Doctrine*

■ Piper contends that Union County's breach of fiduciary duty and negligent misrepresentation claims are barred by the economic loss doctrine.[47] The economic loss doctrine generally prohibits tort recovery for purely economic losses, relegating such claims to contract law. *See Nelson v. Todd's Ltd.*, 426 N.W.2d 120, 122 (Iowa 1988) ("A plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable."); *Richards v. Midland Brick Sales Co.*, 551 N.W.2d 649, 650 (Iowa Ct.App. 1996) (stating that the economic loss doctrine is a "generally recognized principle of law that plaintiffs cannot recover in tort when they have suffered only economic harm").

■ The Iowa Supreme Court recently held that the doctrine "provides no bar to the recovery of economic losses caused by a negligent misrepresentation." *Van Sickle Const. Co. v. Wachovia Commercial Mortgage, Inc.*, 783 N.W.2d 684, 693 (Iowa 2010) ("We conclude that the purposes of the economic loss doctrine would not be served by applying it to negligent misrepresentation claims."); *see also Burns Philp Inc. v. Cox, Kliewer & Co., P.C.*, No. 4:99–cv–900033, 2000 WL 33361992, at *7

---

**47.** Piper originally argued that all of Plaintiff's tort claims were barred by the doctrine, but conceded in its Reply Brief that it is not applicable to claims of fraudulent misrepresentation and professional negligence. *See* Def.'s Reply Br. at 21.

(S.D.Iowa Nov. 2, 2000) (holding, under Iowa law, that "the economic loss doctrine does not apply to negligent misrepresentation claims against professionals"); *Johnson v. Land O' Lakes, Inc.*, 18 F.Supp.2d 985, 1001 (N.D.Iowa 1998) (finding that Iowa law does not bar claim for negligent misrepresentation when such claim is made against a professional). While the applicability of the doctrine in Iowa is less clear with respect to a breach of fiduciary duty claim, the Court can find no Iowa case applying the doctrine to an intentional tort, such as breach of fiduciary duty. *See Estate of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 682 (noting that a claim of breach of fiduciary duty is an intentional tort); *Wilson v. IBP, Inc.*, 558 N.W.2d at 138 (same); *see also Poulsen v. Russell*, 300 N.W.2d 289 (Iowa 1981) (affirming actual damages award, which includes economic loss component, on breach of fiduciary duty claim). Considering this case law in conjunction with the fact that the economic loss doctrine has been deemed generally inapplicable to claims of professional negligence, *see Kemin Indus., Inc. v. KPMG Peat Marwick LLP*, 578 N.W.2d 212 (Iowa 1998), the Court finds that the economic loss doctrine does not operate in this case to bar Plaintiff's claims of negligent misrepresentation and breach of fiduciary duty.

## I. *Punitive Damages*

Piper avers that the record does not support a claim for punitive damages because there is no evidence of intentional conduct. To sustain an award of punitive damages, Union County must prove, by "a preponderance of clear, convincing, and satisfactory evidence," that Piper's conduct

constituted "willful and wanton disregard for the rights or safety of another." Iowa Code § 668A.1. Iowa law defines willful and wanton conduct as conduct in which "the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences." *Fell v. Kewanee Farm Equip. Co.*, 457 N.W.2d 911, 919 (Iowa 1990).

The Court is extremely dubious that the record in this case would support a claim for punitive damages. Nonetheless, it is the Court's practice at trial to bifurcate any punitive damages claims from the case-in-chief. Accordingly, the Court will make a final determination on whether the evidence warrants submission of Plaintiff's claim for punitive damages at trial.[48]

## IV. CONCLUSION

While the decision is exceedingly close, the Court finds that summary judgment is not appropriate at this juncture with respect to Union County's claims of breach of fiduciary duty, negligence, negligent misrepresentation, or fraudulent misrepresentation. The Court does find, however, that Union County's contract claim fails as a matter of law. Accordingly, for the reasons stated herein, Piper's Motion for Summary Judgment (Clerk's No. 127) is GRANTED IN PART and DENIED IN PART.

---

**48.** The Court does not permit any reference at trial to punitive damages during presentation of the case-in-chief. Once the evidence is fully submitted and the case-in-chief submitted to the jury for deliberations, the Court will determine whether evidence of punitive dam-

ages should be permitted. If the Court finds such evidence should be presented to the jury, *and* if the jury returns a verdict in favor of Plaintiff on the case-in-chief, the Court would then conduct a second, punitive damages, phase of trial.